Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Michael Vanunu, Esq.
Melissa D. Medilien, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,
GEICO Indemnity Company, GEICO General Insurance Company
and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY              Docket
COMPANY,                                          No.:_____ (     )

                              Plaintiffs,

            -against-

MARTA MEDICAL SUPPLY, INC., OLEKSANDR
ZUBCHENKO, and JOHN DOE DEFENDANTS "1"–"10,"

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>COMPLAINT</u>

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Marta Medical Supply, Inc.,

Oleksandr Zubchenko, and John Doe Defendants "1" through "10" (collectively, the

"Defendants"), hereby allege as follows:

## INTRODUCTION

1.     This action seeks to recover more than $168,400.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, through Marta Medical Supply, Inc. ("Marta Medical") thousands of fraudulent No-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g., cervical collars, lumbar sacral supports, orthopedic pillows, massagers, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment").  These goods were allegedly provided to individuals who were involved in automobile accidents and eligible for insurance coverage under GEICO insurance policies (the "Insureds").

2.     Marta Medical was incorporated by Oleksandr Zubchenko ("Zubchenko") (together with Marta Medical, the "DME Defendants") who, upon information and belief, also owns, operates, and controls Marta Medical.  The DME Defendants represented Marta Medical to be an authorized retailer of DME and OD located in Brooklyn, New York when, in fact, Marta Medical was never licensed with the New York City Department of Consumer Affairs, dispensed medically unnecessary DME, and operated for the sole purpose of exploiting the New York No-fault insurance system by submitting large volumes of billing to GEICO and other New York automobile insurance companies for Fraudulent Equipment.

3.     Marta Medical and Zubchenko effectuated the scheme by colluding with unlicensed laypersons (the "Clinic Controllers") who manage and control various multidisciplinary medical clinics that primarily treatment no-fault patients (the "No-Fault Clinics") and various healthcare providers (the "Prescribing Practitioners") who prescribed DME and OD Equipment to the Insureds treating at the No-Fault Clinics.  In addition to colluding with the Clinic Controllers and Prescribing Practitioners, the DME Defendants used prescriptions containing forged and/or

photocopied signatures to support inflated claims submitted through Marta Medical seeking reimbursement of No-fault benefits to which the Defendants were never entitled to receive.

4.      By this action, GEICO seeks to recover more than $168,400.00 that Defendants wrongfully stole along with a declaration that it is not legally obligated to pay reimbursement of more than $1,235,000.00 in pending No-fault insurance claims for Fraudulent Equipment that have been submitted by or on behalf of Marta Medical because:

(i)     Marta Medical was not licensed with the New York City Department of Consumer Affairs and therefore, was never eligible for reimbursement of No-fault benefits;

(ii)    The DME Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was provided – to the extent provided at all – pursuant to predetermined fraudulent protocols without regard for genuine patient care;

(iii)   The DME Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds based upon prescriptions received as a result of unlawful financial arrangements with others who are not presently identifiable, including the Clinic Controllers;

(iv)    The DME Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent provided at all – based on decisions made by unlicensed laypersons and/or unauthorized prescriptions rather than prescriptions legitimately issued by the Prescribing Practitioners who are licensed to issue such prescriptions; and

(v)     The DME Defendants' claims for reimbursement fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds and/or fraudulently inflated the permissible reimbursement rates for the Fraudulent Equipment.

5.      The Defendants fall into the following categories:

(i)     Defendant Marta Medical is a New York corporation that purported to dispense Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and billed New York automobile insurance companies including GEICO, for such Fraudulent Equipment.

(ii)    Defendant Zubchenko is the incorporator of Marta Medical. Upon information and belief, Defendant Zubchenko owns, operates, and controls Marta Medical, and used Marta Medical to submit bills to GEICO and other

New York automobile insurance companies for purportedly dispensing Fraudulent Equipment to automobile accident victims.

(iii) John Doe Defendants "1" through "10" are presently not identifiable but include Clinic Controllers who are not licensed healthcare professionals but who illegally own and control the No-Fault Clinics, and who conspired with Marta Medical and Zubchenko to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

6. As discussed below, the Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO by Marta Medical were fraudulent because: (i) Marta Medical was not licensed with the New York City Department of Consumer Affairs and therefore, was never eligible for reimbursement of No-fault benefits; (ii) The DME Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was provided – to the extent provided at all – pursuant to predetermined fraudulent protocols without regard for genuine patient care; (iii) The DME Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds based upon prescriptions received as a result of unlawful financial arrangements with others who are not presently identifiable, including the Clinic Controllers; (iv) The DME Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that provided at all –  based on decisions by unlicensed laypersons and/or unauthorized prescriptions rather than legitimate prescriptions issued by the Prescribing Practitioners who are licensed to issue such prescriptions; (v) The DME Defendants' claims for reimbursement fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds and/or fraudulently inflated the permissible reimbursement rates for the Fraudulent Equipment.

7. As such, the DME Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Marta Medical.

8.      The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that the DME Defendants submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme.

9.      The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began in June of 2020 and has continued uninterrupted through the present day as the Defendants continue to pursue collections on their unpaid fraudulent claims.

10.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $168,400.00.

## THE PARTIES

### I.     Plaintiffs

11.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.    Defendants

12.     Defendant Marta Medical is a New York corporation incorporated on or about June 23, 2020, and has its principal place of business in Brooklyn, New York.

13.     Defendant Marta Medical knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

14.     Although Marta Medical is located in Brooklyn, New York, and primarily dispensed DME and OD to Insureds located throughout New York City, at all relevant times it was not licensed to sell DME or OD by the New York City Department of Consumer Affairs.

15.     Defendant Zubchenko resides in and is a citizen of New York.  Zubchenko, who is not and has never been a licensed healthcare provider, owned and controlled Marta Medical and entered into unlawful financial arrangements with the Clinic Controllers and others not presently identifiable in exchange for prescriptions for Fraudulent Equipment.

16.     John Doe Defendants "1" through "10" are citizens of New York who are presently not identifiable but who include the Clinic Controllers who are not licensed healthcare professionals but who illegally own and control the No-Fault Clinics, and who conspired with Marta Medical and Zubchenko to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

18.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

19.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

21.     GEICO underwrites automobile insurance in the State of New York.

## I.     An Overview of the Pertinent Laws

### A.     Pertinent Laws Governing No-Fault Insurance Reimbursement

22.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

23.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

24.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including DME and OD. See N.Y. Ins. Law § 5102(a).

25.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

26.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

27.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

7

28.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

29.     Specifically, New York City's Administrative Code requires suppliers of DME and/or OD to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer Affairs ("DCA") in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

30.     It is unlawful for any supplier of DME and/or OD to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without securing a Dealer in Products License.  See NYC Admin. Code §20-426.

31.     A Dealer in Products License is obtained by filing a license application with the DCA.  The application requires that the applicant identify, among other pertinent information, the commercial address from which the supplier of DME and/or OD is physically operating.

32.     The license application for a Dealer in Products License also requires the applicant to affirm that the affiant is authorized to complete and submit the application on behalf of the corporate entity seeking a license.  The license application further requires that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

33.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. <u>See</u>, <u>e.g.</u>, N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

34.     Prohibited kickbacks include more than a simple payment of a specific monetary amount, but it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". <u>See</u> N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

35.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

36.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

37.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

38.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

39.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

40.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD dispensed pursuant to a lawful prescription from a licensed healthcare provider.  See N.Y. Ins. Law § 5102(a).   By extension, DME or OD dispensed without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under the No-Fault Laws.

41.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

42.   OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs.  These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

43.   To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits is not artificially depleted by inflated DME or OD charges, the New York Fee Schedule includes the maximum charges that may be submitted by suppliers for DME and OD.

44.   In a June 16, 2004, Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

45.   As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)   The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e., the line-item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

11

46.     As indicated by the New York Fee Schedule, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

47.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

48.     For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by suppliers of DME and OD to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet to qualify for reimbursement under a specific HCPCS Code.

49.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

50.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item"), then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

51.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of

any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

52.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions set forth by Palmetto control to determine whether an item of DME or OD qualifies for reimbursement under a specific HCPCS Code.

53.     Additionally, many HCPCS Codes relate to OD that have either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiate between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

54.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner licensed to issue such prescriptions;

(ii)    The prescription for DME or OD is not based any unlawful financial arrangements;

(iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient;

(v)     The fee sought for the DME or OD was not in excess of either the Medicaid Fee Schedule or the standard for a Non-Fee Schedule item; and

(vi)    The provider is in compliance with all relevant rules and regulations governing the distribution of DME and OD.

II.     **The Defendants' Fraudulent Scheme**

    A.    **Overview of the Defendants' Fraudulent Scheme**

    55.    Beginning in 2020, Marta Medical and Zubchenko implemented a complex fraudulent scheme in which Marta Medical was used as a vehicle to bill GEICO and other New York automobile insurers millions of dollars in No-Fault Benefits to which the DME Defendants were never entitled to receive.

    56.    Zubchenko incorporated Marta Medical on or about June 23, 2020 and commenced billing to GEICO for Fraudulent Equipment allegedly dispensed to Insureds *the very next day* on June 24, 2020.  Despite being a newly incorporated supplier of DME and OD with no pre-existing patients, from June 24, 2020 through June 30, 2020 – Marta Medical's first six days in business – the DME Defendants submitted to GEICO alone over $255,000.00 in claims for reimbursement for Fraudulent Equipment allegedly provided to Insureds.

    57.    To date, the DME Defendants have submitted through Marta Medical more than $1,977,000.00 in fraudulent claims to GEICO seeking reimbursement for Fraudulent Equipment and have wrongfully obtained more than $168,400.00 from GEICO.  Moreover, there is more than $1,235,000.00 in additional fraudulent claims that have yet to be adjudicated, but for which the DME Defendants continue to seek payment from GEICO for Fraudulent Equipment.

    58.    As set forth in more detail below, the prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were not based on medical necessity or genuine patient care, but rather were issued pursuant to predetermined fraudulent protocols that were established by the DME Defendants and others who are not presently identifiable, including the Clinic Controllers.

59.     The DME Defendants exploited the Insureds' No-Fault Benefits by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for a combination of Fee Schedule and Non-Fee Schedule items.

60.     To maximize the amount of money they could obtain from GEICO, and other automobile insurers, the DME Defendants obtained generic, vague, and sometimes copied prescriptions for Fraudulent Equipment that were purportedly issued by the Prescribing Practitioners who treated Insureds at various No-Fault Clinics in the New York Metropolitan region, including but not limited to a clinic located at 3250 Westchester Avenue Bronx, New York (the "Westchester Avenue Clinic"), a clinic located at 552 East 180th Street Bronx, New York (the "East 180th Street Clinic") and a clinic located at 3027 Avenue V Brooklyn, New York (the "Avenue V Clinic").

61.     In order to maintain employment at the No-Fault Clinics, or in exchange for other financial compensation or incentive, the Prescribing Practitioners, at the direction of the Clinic Controllers, would purportedly issue prescriptions with the same vague and generic descriptions of DME and/or OD to virtually every Insured who was involved in a motor vehicle accident and treated at a particular No-Fault Clinic.

62.     Additionally, in certain instances, the prescriptions for Fraudulent Equipment contained illegally photocopied signatures that were allegedly issued by the Prescribing Practitioners but were never actually signed or otherwise authorized by the Prescribing Practitioners.

63.     The Clinic Controllers then steered the prescriptions back to Marta Medical.  Once the DME Defendants received the prescriptions purportedly issued by the Prescribing Practitioners, they would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items using HCPCS

Codes that were not specifically identified in the prescriptions, and which did not represent the items actually provided to Insureds.

64.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Defendants represented that they provided Insureds with the specific item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a Prescribing Practitioner licensed to prescribe DME and/or OD.

65.     However, in a substantial majority of the claims identified in Exhibit "1", the HCPCS Codes and charges for Fee Schedule items submitted by the DME Defendants to GEICO did not match the items that were actually provided to Insureds – to the extent that any Fraudulent Equipment was provided to the Insureds in the first instance.

66.     Instead, the DME Defendants provided Insureds with Fraudulent Equipment that was less expensive and of inferior quality than the items identified in the bills submitted to GEICO.

67.     The DME Defendants used the intentionally generic, vague and/or photocopied prescriptions to unlawfully choose one of many variations of Fee Schedule items that could be provided to the Insureds.  The DME Defendants provided insureds with Fraudulent Equipment of inferior quality and with lower reimbursement rates, but then submitted bills to GEICO seeking reimbursement for Fraudulent Equipment of higher quality and with more expensive reimbursement rates.

68.     The Fee Schedule items provided to Insureds – to the extent that any Fraudulent Equipment was provided – were reimbursable under different HCPCS Codes, which had significantly lower maximum reimbursement rates than the HCPCS Codes the DME Defendants submitted to GEICO on their claims for reimbursement.

69.     In furtherance of their scheme to defraud GEICO, the DME Defendants also submitted bills for Non-Fee Schedule items, which falsely indicated the DME Defendants were seeking reimbursement at the lesser of either 150% of the DME Defendants' legitimate acquisition cost or the cost to the general public for the same item.

70.     To the contrary, the DME Defendants grossly inflated the rate of reimbursement for the Non-Fee Schedule items purportedly provided to Insureds.

71.     As part of this scheme, the DME Defendants submitted bills to GEICO seeking reimbursement for Non-Fee Schedule items with higher reimbursement rates and of higher quality than the items actually provided to Insureds.

72.     In fact, although the DME Defendants submitted bills to GEICO seeking reimbursement for Non-Fee Schedule items with high reimbursement rates, the items actually provided to Insureds were easily obtainable from legitimate Internet and brick-and-motor retailers for a fraction of the reimbursement rates identified in the bills submitted to GEICO.

73.     The DME Defendants routinely submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Non-Fee Schedule items at rates that were grossly above the permissible reimbursement amount for such items to maximize the amount of No-Fault Benefits that they could receive.

**B.     The DME Defendants' Failure to Comply with Local Licensing Requirements**

74.     The DME Defendants were never entitled to reimbursement from GEICO since, at all relevant times, Marta Medical was not licensed with DCA and therefore, is not eligible for reimbursement of No-Fault Benefits.

75.     Although the DME Defendants purported to be licensed suppliers of DME and OD, the DME Defendants were never properly licensed to engage in this business.

76.     To bill for or to collect No-Fault Benefits, a supplier of DME and/or OD must meet all state and local licensing requirements. <u>See</u> 11 N.Y.C.R.R. § 65-3.16(a)(12).

77.     To lawfully engage in the business of supplying DME and/or OD to the disabled in New York City, all suppliers of DME and OD must first obtain a Dealer in Products License issued by DCA.  <u>See</u> 6 RCNY § 2-271; NYC Admin. Code §20-425.

78.     It is unlawful to engage in the business of selling, renting, fitting, or adjusting DME or OD to the disabled without obtaining proper licensing from DCA.  <u>See</u> NYC Admin. Code §20-426.

79.     Marta Medical is located in Brooklyn, New York and purports to sell and adjust DME and OD to Insureds throughout New York City.

80.     As such, the DME Defendants were required to obtain a Dealer in Products License from DCA.

81.     Since the DME Defendants failed to obtain such licensing from DCA, the DME Defendants were never authorized to sell or adjust DME or OD to any Insured in New York City.

82.     Therefore, even absent the Defendants' other fraudulent conduct, the DME Defendants were never eligible to bill for or to collect No-Fault Benefits from any insurer since Marta Medical failed to comply with local licensing requirements.

C.     **The Defendants' Illegal Financial Arrangements**

83.     In order to implement and execute their fraudulent scheme and maximize the No-Fault Benefits they could obtain from GEICO and other New York automobile insures, the DME Defendants entered into illegal financial agreements with Clinic Controllers who caused the Prescribing Practitioners working at their No-Fault Clinics to intentionally issue vague and generic prescriptions for Fraudulent Equipment and/or who simply copied and recycled the Prescribing Practitioners' signatures to issue prescriptions never actually signed or otherwise

authorized by the Prescribing Practitioners.   These vague, generic and/or photocopied prescriptions were then routed to the DME Defendants who submitted them in support of their claims to GEICO seeking reimbursement for DME and OD purportedly dispensed to Insureds.

84.     Since at least June of 2020, the DME Defendants have engaged in unlawful financial arrangements with the Clinic Controllers, including paying kickbacks to the Clinic Controllers in exchange for obtaining prescriptions for Fraudulent Equipment that could be dispensed and billed for by Marta Medical.  The unlawful financial arrangements allowed the DME Defendants to submit thousands of charges for Fraudulent Equipment to GEICO and other New York automobile insurers purportedly dispensed by Prescribing Practitioners at the No-Fault Clinics.

85.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the No-Fault Clinics, are actually organized as "one-stop" shops for no-fault insurance fraud.  The No-Fault Clinics provide facilities for the Prescribing Practitioners, as well as a "revolving door" of medical professional corporations, all geared towards exploiting New York's no-fault insurance system.

86.     In fact, GEICO has received billing from many of the No-Fault Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

87.     For example, GEICO has received billing for purported healthcare services rendered at the East 180th Street Clinic from a "revolving door" of over 50 different health care providers.

88.     As a further example, GEICO has received billing for purported healthcare services rendered at the Avenue V Clinic from a "revolving door" of over 70 different health care providers.

89.     As a further example, GEICO has received billing for purported healthcare services rendered at the Westchester Avenue Clinic from a "revolving door" of over 80 different health care providers.

90.     Pursuant to the unlawful financial arrangements, the DME Defendants would pay kickbacks to the Clinic Controllers who, in return, would cause the Prescribing Practitioners to issue prescriptions for Fraudulent Equipment to motor vehicle accident victims treating at the No-Fault Clinics and then route those prescriptions to the DME Defendants.

91.     Unlicensed laypersons, rather than the healthcare professionals working in the No-Fault Clinics, created and controlled the patient base at the No-Fault Clinics, and directed fraudulent treatment protocols used to maximize profits without regard to actual patient care.

92.     In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, including illegal kickbacks, between the DME Defendants and the Clinic Controllers, Zubchenko, in some instances, obtained prescriptions containing photocopied or forged prescriptions which the DME Defendants submitted in support of Marta Medical's claims for reimbursement without the authorization of the Prescribing Practitioner.

93.     At other times, the Prescribing Practitioners issued prescriptions to Insureds treating at the No-Fault Clinics without regard for medical necessity in exchange for financial incentives or as a condition to their ability to work at the No-Fault Clinics (and access the clinics' patient base for their own fraudulent billing).

94.     Certain of the Prescribing Practitioners who purportedly issued the prescriptions that were steered to the DME Defendants are no strangers to No-fault insurance fraud schemes.

95.     For example, John Greco, M.D. ("Dr. Greco") is a physician who purportedly issued prescriptions for Fraudulent Equipment to Insureds at the Westchester Avenue Clinic, which were then provided to and used by the DME Defendants to bill GEICO.  Dr. Greco purportedly treated automobile accident victims at this Clinic through Metro Pain Specialists, P.C. ("Metro Pain").  Metro Pain is a professional corporation that has been named as a defendant in multiple No-fault insurance fraud cases involving fraudulent services billed to No-fault insurers.  See State Farm Mut. Ins. Co., et al. v. Metro Pain Specialists, P.C., et al, 21-cv-05523 (E.D.N.Y.); Allstate Ins. Co., et al. v. Metro Pain Specialists P.C., et al., 21-cv-05586 (E.D.N.Y.).

96.     Moreover, A physician who previously worked for Metro Pain over a two-year period stated under oath that as a condition of employment he was instructed to order unnecessary urine drug testing for every patient who treated with Metro Pain regardless of whether such testing was necessary.  This physician further stated that he resigned from Metro Pain upon learning that Metro Pain issued prescriptions for pharmaceuticals in his name without his knowledge or consent.

97.     As a further example, Arkam Rehman, M.D. ("Dr. Rehman") is a physician who purportedly issued prescriptions for Fraudulent Equipment to Insureds at the Avenue V Clinic, which were then provided to and used by the DME Defendants to bill GEICO. Dr. Rehman purportedly treated automobile accident victims at this Clinic through Apex Medical, P.C. ("Apex Medical"). Dr. Rehman and Apex Medical were recently sued by GEICO for submitting millions of dollars in fraudulent billing.  See Government Employees Ins. Co. et al v. Apex Medical, P.C. et al, 1:21-cv-05921(MKB)(RLM) (E.D.N.Y. 2021).

98.     In keeping with the fact that the Defendants engaged in unlawful financial arrangements, the DME Defendants obtained prescriptions for Fraudulent Equipment directly from the Clinic Controllers without any communication or involvement by the Insureds.

99.     As a result of the unlawful financial arrangements, the DME Defendants drastically increased the volume of their billing to GEICO and other New York automobile insurers for Fraudulent Equipment.

**D.     The Defendants' Fraudulent Prescription Protocol**

100.    The prescriptions for Fraudulent Equipment were issued pursuant to predetermined fraudulent protocols that were designed to maximize the billing the DME Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

101.    In the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents – to the extent that they were involved in any actual accidents at all.

102.    Accordingly, almost none of the Insureds identified in Exhibit "1" whom the Prescribing Practitioners purported to treat, suffered from any significant injuries or health problems as a result of being involved in the relatively minor accidents.

103.    In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – many of the Insureds did not seek treatment at any hospital as a result of their accidents

104.    To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and were discharged with nothing more than a minor soft tissue injury such as a sprain or strain.

105.   However, despite the Insureds being involved in relatively minor, low-impact accidents and only suffering from minor injuries, practically all the Insureds who treated with each of the Prescribing Practitioners were subject to similar treatment regimens which included virtually identical prescriptions for Fraudulent Equipment by the specific Prescribing Practitioner.

106.   The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were not based on medical necessity but rather were issued pursuant to predetermined fraudulent protocols that were established by the DME Defendants and others who are not presently identifiable, including the Clinic Controllers.

107.   No legitimate physician or other licensed healthcare provider, or professional entity would issue or otherwise permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

108.   In general, the DME Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Prescribing Practitioners pursuant to the following predetermined fraudulent protocols:

- the Insured would arrive at a No-Fault Clinic for treatment subsequent to a motor vehicle accident;

- the Insured would be seen by a Prescribing Practitioner;

- on the date of the first visit, the provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD;

- subsequently, the Insured would return to the No-Fault Clinic for one or more additional evaluations (as well as a conservative treatment regimen that included, among others, physical therapy, chiropractic care, and acupuncture rendered by other healthcare providers) and would be provided with at least one additional prescription for a predetermined set of DME and/or OD – if not more, although the Prescribing Practitioner did not always treat or evaluate the Insured on the date the additional DME and/or OD was prescribed; and

- at least one, if not more than one, prescription for DME and/or OD would be directly provided to the DME Defendants to fill without any involvement by the Insured.

109.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.  These factors include, for example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact, among others.

110.   In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints and presentation are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

111.   Furthermore, in a legitimate setting during the course of a patient's treatment, a healthcare provider <u>may</u> prescribe DME and/or OD that will aid in the patient's treatment.

112.   In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's injury or condition; and (iii) whether the patient is likely to use the DME and/or OD.  In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

113.   If a healthcare provider determines that DME and/or OD is medically necessary to aid in a patient's course of treatment, in a legitimate healthcare setting the provider will not only issue a prescription for the appropriate DME and/or OD equipment but will contemporaneously indicate the specific type of DME and/or OD prescribed in a contemporaneous medical record such as an evaluation report.

114.   Given the multiple variables which affect whether and to what extent an insured is injured in an automobile accident, it is improbable that Insureds involved in the same motor vehicle accident will be prescribed the same or substantially same types of DME and/or OD equipment.

115.   Despite this improbability, Marta Medical routinely received prescriptions allegedly authorized by the Prescribing Practitioners to dispense an array of identical or nearly identical DME and/or OD equipment to Insureds involved in the same motor vehicle accident.

116.   For example:

(i)     On July 9, 2020, three Insureds – GCC, SH and MG – were involved in the same automobile accident.  Marta Medical dispensed Fraudulent Equipment to the Insureds pursuant to identical, or nearly identical, prescriptions purportedly issued by Prescribing Practitioner Dr. Greco for:

| Patient | DME | Charges to GEICO |
|---------|-----|------------------|
| GCC | (1) a "cervical traction w/ pump", (2) an "infrared heating lamp", (3) a "lumbar traction w/ pump", and (4) a "whirlpool" | L0112 $1265.35 E0691 $673.94 E2616 $550.21 E1310 $1610.55 |
| SH | (1) a "cervical traction w/ pump"; (2) an "infrared heating lamp", (3) a "lumbar traction w/ pump", and (4) an "whirlpool" | L0112 $1265.35 E0691 $673.94 E2616 $550.21 E1310 $1610.55 |
| MG | (1) a "cervical traction w/ pump", (2) an "infrared heating lamp", (3) a "lumbar traction w/ pump", (4) a "whirlpool", and (5) a "massager" | L0112 $1265.35 E0691 $673.94 E2616 $550.21 E1310 $1610.55 E1399 $188.21 |

(ii)    On July 3, 2020, two Insureds – KD and RP – were involved in the same automobile accident.  Marta Medical dispensed Fraudulent Equipment to the Insureds pursuant to identical, or nearly identical, prescriptions purportedly issued by Prescribing Practitioner Dr. Ciechorska for:

| Patient | DME | Charges to GEICO |
|---|---|---|
| KD | (1) an "EMS unit + kit", <br>(2) an "EMS placement belt", <br>(3) an "electric massager", <br>(4) an "infrared heat lamp", and <br>(5) a "hydrotherapy whirlpool" | E0762 $535.26 <br>E0731 $82.50 <br>E1399 $188.21 <br>E0691 $673.94 <br>E1310 $1610.55 |
| RP | (1) an "EMS unit + kit", <br>(2) an "EMS placement belt", <br>(3) an "electric massager", <br>(4) an "infrared heat lamp", and <br>(5) a "hydrotherapy whirlpool" | E0762 $535.26 <br>E0731 $82.50 <br>E1399 $188.21 <br>E0691 $673.94 <br>E1310 $1610.55 |

(iii)     On July 2, 2020, two Insureds – RR and AR – were involved in the same automobile accident.  Marta Medical dispensed Fraudulent Equipment to the Insureds pursuant to identical, or nearly identical, prescriptions purportedly issued by Prescribing Practitioner Dr. Ciechorska for:

| Patient | DME | Charges to GEICO |
|---|---|---|
| RR | (1) an "EMS unit + kit", <br>(2) an "EMS placement belt", <br>(3) an "electric massager", <br>(4) an "infrared heat lamp", and <br>(5) a "hydrotherapy whirlpool" | E0762 $535.26 <br>E0944 $40.90 <br>E1399 $188.21 <br>E0691 $673.94 <br>E1310 $1610.55 |
| AR | (1) an "EMS unit + kit", <br>(2) an "EMS placement belt", <br>(3) an "electric massager", <br>(4) an "infrared heat lamp", and <br>(5) a "hydrotherapy whirlpool" | E0762 $535.26 <br>E0944 $40.90 <br>E1399 $188.21 <br>E0691 $673.94 <br>E1310 $1610.55 |

(iv)     On May 15, 2020, two Insureds – MD and JD – were involved in the same automobile accident.  Marta Medical dispensed Fraudulent Equipment to the Insureds pursuant to identical, or nearly identical, prescriptions purportedly issued by Prescribing Practitioner Dr. Greco for:

| Patient | DME | Charges to GEICO |
|---------|-----|------------------|
| MD | (1) a "cervical traction w/ pump",<br>(2) a "lumbar traction w/pump",<br>(3) an "infrared lamp",<br>(4) a "whirlpool", and<br>(5) a "massager" | L0112 $1265.35<br>E2616 $550.21<br>E0691 $673.94<br>E1310 $1610.55<br>E1399 $188.21 |
| JD | (1) a "cervical traction w/ pump",<br>(2) a "lumbar traction w/pump",<br>(3) an "infrared lamp",<br>(4) a "whirlpool", and<br>(5) a "massager" | L0112 $1265.35<br>E2616 $550.21<br>E0691 $673.94<br>E1310 $1610.55<br>E1399 $188.21 |

(v)     On July 9, 2020, three Insureds – AC, RD, and BR – were involved in the same automobile accident.  Marta Medical dispensed Fraudulent Equipment to the Insureds pursuant to identical, or nearly identical prescriptions purportedly issued by Prescribing Practitioner Dr. Greco for:

| Patient | DME | Charges to GEICO |
|---------|-----|------------------|
| AC | (1) a "cervical traction w/ pump",<br>(2) a "lumbar traction w/pump",<br>(3) an "infrared lamp",<br>(4) a "whirlpool", and<br>(5) a "massager" | L0112 $1265.35<br>E2616 $550.21<br>E0691 $673.94<br>E1310 $1610.55<br>E1399 $188.21 |
| RD | (1) a "cervical traction w/ pump",<br>(2) a "lumbar traction w/pump",<br>(3) a "infrared lamp",<br>(4) a "whirlpool", and<br>(5) a "massager" | L0112 $1265.35<br>E2616 $550.21<br>E0691 $673.94<br>E1310 $1610.55<br>E1399 $188.21 |
| BR | (1) a "cervical traction w/ pump",<br>(2) a "lumbar traction w/pump",<br>(3) an "infrared lamp",<br>(4) a "whirlpool", and<br>(5) a "massager" | L0112 $1265.35<br>E2616 $550.21<br>E0691 $673.94<br>E1310 $1610.55<br>E1399 $188.21 |

(vi)    On July 21, 2020, two Insureds – MD and MD – were involved in the same automobile accident.  Marta Medical dispensed Fraudulent Equipment to the Insureds pursuant to identical, or nearly identical, prescriptions purportedly issued by Prescribing Practitioner Dr. Greco for:

| Patient | DME | Charges to GEICO |
|---------|-----|------------------|
| MD | (1) a "cervical traction w/ pump",<br>(2) an "infrared heating lamp",<br>(3) a "lumbar traction w/pump", and<br>(4) a "whirlpool" | L0112 $1265.35<br>E0691 $673.94<br>E2616 $550.21<br>E1310 $1610.55 |
| MD | (1) a "cervical traction w/ pump",<br>(2) an "infrared heating lamp",<br>(3) a "lumbar traction w/pump", and<br>(4) a "whirlpool" | L0112 $1265.35<br>E0691 $673.94<br>E2616 $550.21<br>E1310 $1610.55 |

    (vii)    On August 23, 2020, two Insureds – BG, BM, and JR – were involved in the same automobile accident.  Marta Medical dispensed Fraudulent Equipment to the Insureds pursuant to identical, or nearly identical, prescriptions purportedly issued by Prescribing Practitioner Dr. Greco for:

| Patient | DME | Charges to GEICO |
|---------|-----|------------------|
| BG | (1) a "cervical collar",<br>(2) a "LSO lumbar support",<br>(3) a "bed board",<br>(4) a "cervical pillow",<br>(5) a "dry pressure mattress",<br>(6) a "back massager",<br>(7) a "water circulating w/pad w/pump", and<br>(8) a "thermophore/heating pad" | L0200 $322.50<br>L0634 $759.92<br>E0274 $101.85<br>E0190 $22.04<br>E0272 $155.52<br>E1399 $188.21<br>E0217 $548.86<br>E0215 $20.93 |
| BM | (1) a "cervical collar",<br>(2) a "lso lumbar support",<br>(3) a "bed board",<br>(4) a "cervical pillow",<br>(5) a "dry pressure mattress",<br>(6) a "back massager",<br>(7) a "water circulating w/pad w/pump", and<br>(8) a "thermophore/heating pad" | L0200 $322.50<br>L0634 $759.92<br>E0274 $101.85<br>E0190 $22.04<br>E0272 $155.52<br>E1399 $188.21<br>E0217 $548.86<br>E0215 $20.93 |

| JR | (1) a "cervical collar",<br>(2) a "lso lumbar support",<br>(3) a "bed board",<br>(4) a "cervical pillow",<br>(5) a "dry pressure mattress",<br>(6) a "back massager",<br>(7) a "water circulating w/pad w/pump", and<br>(8) a "thermophore/heating pad" | L0200 $322.50<br>L0634 $759.92<br>E0274 $101.85<br>E0190 $22.04<br>E0272 $155.52<br>E1399 $188.21<br>E0217 $548.86<br>E0215 $20.93 |

(viii)   On August 19, 2020, two Insureds – AO, Jr. and AR, Sr. – were involved in the same automobile accident.   Marta Medical dispensed Fraudulent Equipment to the Insureds pursuant to identical, or nearly identical, prescriptions purportedly issued by Prescribing Practitioner Dr. Greco for:

| Patient | DME | Charges to GEICO |
|---|---|---|
| AO, Jr. | (1) a "cervical collar",<br>(2) a "LSO lumbar support",<br>(3) a "bed board",<br>(4) a "cervical pillow",<br>(5) a "dry pressure mattress",<br>(6) a "back massager",<br>(7) a "car seat support/orthopedic",<br>(8) a "water circulating w/pad w/pump", and<br>(9) a "thermophore/heating pad" | E0215 $20.93<br>L0634 $759.92<br>E0272 $155.52<br>E1399 $188.21<br>T5001 $756.03<br>E0190 $22.04<br>E0217 $548.86<br>E0274 $101.85<br>L0200 $322.50 |
| AR, Sr. | (1) a "cervical collar",<br>(2) a "LSO lumbar support",<br>(3) a "bed board",<br>(4) a "cervical pillow",<br>(5) a "dry pressure mattress",<br>(6) a "back massager",<br>(7) a "car seat support/orthopedic",<br>(8) a "water circulating w/pad w/pump", and<br>(9) a "thermophore/heating pad" | E0215 $20.93<br>L0634 $759.92<br>E0272 $155.52<br>E1399 $188.21<br>T5001 $756.03<br>E0190 $22.04<br>E0217 $548.86<br>E0274 $101.85<br>L0200 $322.50 |

(ix)     On June 7, 2020, two Insureds – SS and TTB – were involved in the same automobile accident.  Marta Medical dispensed Fraudulent Equipment to the Insureds pursuant to identical, or nearly identical, prescriptions purportedly issued by Prescribing Practitioner Dr. Rehman for:

| Patient | DME | Charges to GEICO |
|---|---|---|
| SS | (1) an "EMS Unit 4 Lead";<br>(2) a "massager";<br>(3) an "infrared heat lamp"; and<br>(4) a "whirlpool" | E0762 $535.26<br>E0944 $40.90<br>E1399 $188.21<br>E1310 $1610.55 |
| TTB | (1) an "EMS Unit 4 Lead";<br>(2) a "massager";<br>(3) an "infrared heat lamp"; and<br>(4) a whirlpool | E0762 $535.26<br>E0944 $40.90<br>E1399 $188.21<br>E0691 $673.94<br>E1310 $1610.55 |

(x)     On May 6, 2020, three Insureds – ET, AP and JT – were involved in the same motor vehicle accident.  Marta Medical dispensed Fraudulent Equipment to the Insureds pursuant to identical, or nearly identical, prescriptions purportedly issued by Prescribing Practitioner Dr. Rehman for:

| Patient | DME | Charges to GEICO |
|---|---|---|
| ET | (1) a "lumbar sacral orthosis MRI" | L0632 $1150.00 |
| AP | (1) a "lumbar sacral orthosis MRI" | L0632 $1150.00 |
| JT | (1) a "lumbar sacral orthosis MRI" | L0632 $1150.00 |

117.   It is even more improbable that Insureds involved in different motor vehicle accidents, will be prescribed the same or substantially same types of DME and/or OD.

118.   Even more so, it is improbable that Insureds involved in different motor vehicle accidents, who were prescribed DME and/or OD equipment by health care providers throughout

the New York Metropolitan area would be issued DME and/or OD equipment by the same supplier of such equipment.

119.   While the specific preset of prescriptions for Fraudulent Equipment varied based upon the Prescribing Practitioner, there were multiple items of Fraudulent Equipment that were purportedly prescribed to virtually all the Insureds identified in Exhibit "1".

120.   For example, following a purported initial evaluation, the Prescribing Practitioners would purportedly issue a prescription to an Insured which included some if not all of the following DME and/or OD: (i) a cervical collar; (iii) a cervical pillow also referred to as an orthopedic pillow; (iii) a bed board, also referred to as an orthopedic bed board; and/or (vi) an egg crate mattress, also referred to as a dry pressure mattress or mattress foam rubber.

121.   Even more, the Prescribing Practitioners working at one of the No-Fault Clinics would typically issue an additional prescription for Fraudulent Equipment that included: (i) a whirlpool, also referred to as a hydrotherapy whirlpool; (ii) a massager, also referred to as an electric massager; (iii) an infrared heat lamp; and/or (iv) a TENS Unit or an EMS Unit.

122.   In addition to the aforementioned prescriptions for Fraudulent Equipment, the DME Defendants frequently received one or more prescriptions for certain type of OD such as: (i) a cervical traction unit; and/or (ii) a custom fitted orthotic.

123.   The Prescribing Practitioners often issued prescriptions for DME and/or OD which contravened the Insured's conservative treatment plan.

124.   For example, virtually every Insured was provided with at least one prescription for Fraudulent Equipment that called for immobilizing devices, such as a lumbosacral brace (sometimes referred to as lumbar sacral support or LSO) or a cervical collar. By contrast, virtually every Insured was also prescribed physical therapy treatments which called for bending and stretching to strengthen weakened parts of the body.

125.   The prescribed immobilizing devices contravene the mobilizing physical therapy treatments also prescribed to the Insureds.  In the context of treatment for injuries related to minor and low-impact motor vehicle accidents, no legitimate physician or other licensed healthcare provider acting in each patient's best interest would prescribe both mobilizing physical therapy and immobilizing devices at the same time.

126.   In further keeping with the fact that the prescriptions for Fraudulent Equipment were part of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Prescribing Practitioners were never given to the Insureds.

127.   Instead, the Insureds were provided with Fraudulent Equipment directly from the No-Fault Clinic's receptionists – to the extent that the Insureds actually received any Fraudulent Equipment in the first instance.

128.   The DME Defendants then subsequently billed GEICO for DME and OD with HCPCS codes, which had higher maximum reimbursement rates than the equipment actually dispensed to Insureds.

129.   The prescriptions for Fraudulent Equipment submitted by the DME Defendants to support the charges identified in Exhibit "1" were medically unnecessary and were obtained as a result of predetermined fraudulent protocols and unlawful financial arrangements among the Defendants.

### 1)      The Predetermined Fraudulent Protocol at the Westchester Avenue Clinic

130.   The DME Defendants conspired with the Clinic Controllers at the Westchester Avenue Clinic to obtain prescriptions for medically unnecessary Fraudulent DME and OD from Prescribing Practitioners at the No-Fault Clinic pursuant to a predetermined fraudulent protocol and unlawful financial arrangements.

131. Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds who received treatment with Metro Pain at the Westchester Avenue Clinic were purportedly provided with an initial evaluation and/or a prolonged service outcome assessment testing from a healthcare provider associated with Metro Pain, including Dr. Greco.

132. Then on either the same date of the initial or shortly thereafter, a healthcare provider associated with Metro Pain would issue a prescription to the Insured for DME and/or OD.

133. Regardless of an Insured's age, physical condition, or the severity of the Insured's injury – or lack thereof – the first prescription for DME and/or OD issued by a healthcare provider associated with Metro Pain at the Westchester Avenue Clinic, including Dr. Greco, would virtually always include the following Fraudulent Equipment: (i) a "bed board"; (ii) a "dry pressure mattress"; (iii) a "water circulating heat pad w/pump"; (iv) a "thermophore/heating pad"; (v) a "cervical collar"; and (vi) a "cervical pillow".

134. In addition to these items, the first prescription for DME and/or OD would often also include a prescription for "LSO lumbar support".

135. Insureds who continued treating with Metro Pain at the Westchester Avenue Clinic, would virtually always be provided with an additional prescription for DME and/or OD.

136. Regardless of an Insured's age, physical condition, or the severity of the Insured's injury – or lack thereof – an Insured who received two or more prescriptions for DME and/or OD issued by a healthcare provider associated with Metro Pain at the Westchester Avenue Clinic, including Dr. Greco, would either receive a prescription for (1) a custom orthotic device and/or (2) or a prescription for the following Fraudulent Equipment: (i) a "cervical traction w/pump"; (ii) an "infrared lamp"; (iii) a "whirlpool"; and (iv) a "lumbar traction w/ pump" and/or "massager".

137.   Dr. Greco and other Prescribing Practitioners associated with the Westchester Avenue Clinic would often purportedly issue multiple prescriptions for DME and/or OD to the same Insured on the same date.

138.   Dr. Greco and other Prescribing Practitioners associated with the Westchester Avenue Clinic purportedly issued prescriptions for Fraudulent Equipment on dates when it does not appear the Insured treated with a healthcare provider associated with Metro Pain at the Westchester Avenue Clinic.

139.   Virtually none of the prescriptions purportedly issued by healthcare providers associated with Metro Pain at the Westchester Avenue Clinic, including Dr. Greco, contained any corresponding HCPCS codes for the items prescribed, but rather contained general descriptions of various DME and/or OD.

140.   Examples of the predetermined fraudulent prescription protocol implemented at the Westchester Avenue Clinic and which resulted in claims for reimbursement submitted to GEICO by the DME Defendants, include the following:

(i)   On July 2, 2020, an Insured named CJ was purportedly involved in a motor vehicle accident and shortly thereafter began treating with Metro Pain at the Westchester Avenue Clinic.   Dr. Greco purportedly issued four prescriptions in CJ's name.   The first prescription was issued on July 9, 2020 for the following Fraudulent Equipment: (1) a "cervical collar"; (2) a "bed board"; (3) a "cervical pillow"; (4) a "dry pressure mattress"; (5) a "water circulating heat pad w/pad w/pump"; (6) a "thermophore/heating pad"; (7) a "back massager" and (8) "LSO lumbar support".   The additional prescriptions were both issued on August 7, 2020 for a "LSO w/APL control fitted/ADJ" and a "cervical traction".   A prescription was then issued on August 20, 2020 in CJ's name for the following Fraudulent Equipment: (1) a "cervical traction w/pump"; (ii) an "infrared heating lamp"; (iii) a "lumbar traction w/pump"; and (iv) a "whirlpool".   Notably, despite the fact that a prescription was issued on July 9, 2020, it does not appear that Dr. Greco examined this patient on or before this date.

(ii)   On July 13, 2020, an Insured named DJ was purportedly involved in a motor vehicle accident. After an initial evaluation and a prolonged service outcome assessment, Dr. Greco issued a prescription in DJ's name on July

15, 2020 for the following Fraudulent Equipment: (1) a "cervical collar"; (2) a "cervical pillow"; (3) a "dry pressure mattress"; (4) a "water circulating heat pad w/ pump"; (5) a "thermophore/heating pad"; and (6) a "bed board". On August 24, 2020, a second prescription was issued in DJ's name for the following Fraudulent Equipment: (1) a "cervical traction w/pump"; (2) an "infrared lamp"; (3) a "whirlpool"; and (4) a "massager". Then, although it does not appear that DJ treated with Metro Pain at the Westchester Avenue Clinic on September 30, 2020, a third prescription was issued in DJ's name on this date for a "cust shoulder support lt".

(iii)     On June 26, 2020, an Insured named TR was purportedly involved in a motor vehicle accident. After an initial evaluation and prolonged service outcome assessment, Dr. Greco issued a prescription in TR's name on June 29, 2020 for the following Fraudulent Equipment: (1) "LSO lumbar support"; (2) a "bed board"; (3) a "dry pressure mattress"; (4) a "water circulating heat pad w/pump"; (5) a "thermophore/heating pad"; (6) a "knee orthosis, elastic-L"; (7) a "cervical collar"; and (8) a "cervical pillow". On August 3, 2020, a second prescription was issued in TR's name for the following Fraudulent Equipment: (1) a "cervical traction w/ pump"; (ii) a "lumbar traction w/ pump"; (iii) an "infrared lamp"; (iv) a "whirlpool"; and (5) a "massager". Thereafter, although it does not appear TR treated with Metro Pain at the Westchester Avenue Clinic on August 31, 2020, two additional separate prescriptions were issued in TR's name on this date. The first prescription was issued for a "cervical traction" and the second prescription was issued for a "KO adjustable knee joints rigid". On September 7, 2020, Marta Medical also provided TR with an "LSO w/ APL control fitted/adj" pursuant to an undated prescription issued in TR's name by a Prescribing Practitioner associated with the Westchester Avenue Clinic.

(iv)     On September 2, 2020, an Insured named DR was purportedly involved in a motor vehicle accident.   After an initial evaluation and prolonged assessment Dr. Greco purportedly issued a prescription in DR's name on September 2, 2020 for the following Fraudulent Equipment: (1) a "cervical collar"; (2) a "bed board"; (3) a "cervical pillow"; (4) a "dry pressure mattress"; (6) a "water circulating heat pad w/pump"; (5) a "thermophore/heating pad"; and (6) a "cervical pillow". On October 2, 2020, two additional prescriptions were issued. One prescription was issued for a "cervical traction" and the second prescription was issued for the following Fraudulent Equipment: (1) a "cervical traction w/pump"; (2) an "infrared lamp"; (3) a "whirlpool"; and (4) a "massager".

(v)     On August 22, 2020, an Insured named RS was purportedly involved in a motor vehicle accident.  After a purported initial evaluation and a prolonged service outcome assessment of RS, Dr. Greco purportedly issued a prescription on August 26, 2020 in RS' name for the following Fraudulent Equipment: (1) a "cervical collar"; (2) "LSO lumbar support"; (3) a "knee

orthosis, elastic-RL"; (4) "wrist support-R"; (5) a "bed board"; (6) a "cervical pillow"; (7) a "dry pressure mattress"; (8) a "water circulating heat pad w/ pump"; (9) a "thermophore/heating pad; and (10) "shoulder support-RL". Then, although RS did not treat with Metro Pain at the Westchester Avenue Clinic on September 9, 2020, two additional, separate prescriptions were issued in RS' name. The first prescription was issued in RS' name for "shoulder support" and the second prescription was issued in RS' name for "cervical traction". Thereafter, although RS did not treat with Metro Pain at the Westchester Avenue Clinic on September 14, 2020, three additional, separate prescriptions for DME and OD Equipment were issued in RS' name. The first prescription was issued for an "adjustable knee-joint rigid", the second prescription was issued for a "KO Adjustable knee joints rigid", and the third prescription was issued for an "LSO". Thereafter, another prescription was issued on September 30, 2020 for the following Fraudulent Equipment: (1) a "cervical traction w/ pump"; (ii) a "lumbar traction w/ pump"; (iii) an "infrared lamp"; (iv) a "whirlpool"; and (v) a "massager".

(vi)    On July 13, 2020, an Insured named DJM was purportedly involved in a motor vehicle accident. After an initial evaluation and prolonged service outcome assessment of DJM, Dr. Greco issued a prescription in DJM's name for the following Fraudulent Equipment: (1) a "cervical collar"; (2) "LSO lumbar support"; (3) a "bed board"; (4) a "cervical pillow"; (5) a "dry pressure mattress"; (6) a "water circulating heat pad w/pump"; (7) a "thermophore/heating pad"; and (8) "shoulder support-R". Then on July 18, 2020, a prescription was issued in DJM's name for the following Fraudulent Equipment: (1) a "cervical traction w/pump"; (2) a "lumbar traction w/pump"; (3) an "infrared lamp"; (4) a "whirlpool"; and (5) a "massager". Thereafter, although it appears that DJM did not treat with Metro Pain at the Westchester Clinic on August 19, 2020, two prescriptions more were issued on this date in DJM's name for a "LSO w/APL control fitted/ADJ" and a "cervical traction". Then on August 27, 2020, another prescription was issued in DJM's name for a "KO custom fitted". Thereafter, although it appears that DJM did not treat with Metro Pain at the Westchester Avenue Clinic on September 21, 2020, another prescription was issued in DJM's name for a "cust shoulder support lt".

(vii)   On June 26, 2020, an Insured named IM was purportedly involved in a motor vehicle accident and shortly thereafter began treatment with Metro Pain at the Westchester Avenue Clinic. Dr. Greco, or another healthcare provider associated with Mero Pain, issued three separate prescriptions in IM's name. The first was issued on July 1, 2020 for the following Fraudulent Equipment: (1) a "cervical collar"; (s) "LSO lumbar support"; (3) a "bed board"; (4) a "cervical pillow"; (5) a "dry pressure mattress"; (6) a "water circulating heat pad w/ pump"; and (vi) a "thermophore/heating pad". The additional prescriptions were both issued on August 5, 2020 for a "LSO W/APL Control Fitted/ADJ" and a "cervical traction". Then following a purported evaluation and a prolonged service outcome

assessment, a prescription was issued in IM's name on September 16, 2020 for the following Fraudulent Equipment: (1) a "cervical traction w/ pump"; (2) a "lumbar traction w/ pump"; (3) an "infrared lamp"; (4) a "whirlpool"; and (5) a "massager". Notably, despite the fact that prescriptions were issued on July 1, 2020 and August 5, 2020, it does not appear that Dr. Greco, or anyone else associated with Metro Pain, examined this patient on or before these dates.

(viii)   On July 13, 2020, an Insured named DM was purportedly involved in a motor vehicle accident. After an initial evaluation and a prolonged service outcome assessment. Dr. Greco issued a prescription in DM's name on July 15, 2020 for the following Fraudulent Equipment: (1) a "cervical collar; (2) a "bed board"; (3) a "cervical pillow"; (4) a "dry pressure mattress"; (5) a "water circulating heat pad w/ pump"; and (6) a "thermophore/heating pad". Then, although it does not appear DM treated with any Prescribing Practitioner associated with the Westchester Avenue Clinic on August 19, 2020, a prescription for a "cervical traction" was issued in DM's name on this date. Then, on August 24, 2020, a prescription was issued in DM's name for the following Fraudulent Equipment: (1) a "cervical traction w/ pump"; (2) an "infrared lamp"; (3) a "whirlpool"; and (4) a "massager".

(ix)   On August 22, 2020, an Insured named FNN was purportedly involved in a motor vehicle accident. After a purported initial evaluation and a prolonged service outcome assessment of FNN, Dr. Greco purportedly issued a prescription in FNN's name on August 26, 2020 for the following Fraudulent Equipment: (1) a "cervical collar"; (2) "LSO Lumbar Support"; (3) a "bed board"; (4) a "cervical pillow"; (5) a "dry pressure mattress"; (6) a "water circulating heat pad w/ pump"; (6) a "thermophore/heating pad"; and (7) "shoulder support- R /L". Then, although it does not appear FNN treated with Metro Pain at the Westchester Clinic on September 9, 2020 or on September 14, 2020, a total of four separate prescriptions for DME and OD were issued in FNN's name on these dates.  On September 9, 2020, two separate prescriptions were issued in FNN's name- one for a "shoulder support cust" and a second for a  "cervical traction". Then, on September 14, 2020, two additional prescriptions were issued in FNN's name- one for a "shoulder support cust" and the second was issued for a "LSO w/APL control fitted/Adj". Thereafter, on October 18, 2020, a prescription was issued in FNN's name for the following Fraudulent Equipment: (1) a "cervical traction w/ pump"; (2) a "lumbar traction w/ pump"; (3) an "infrared lamp"; (4) a "whirlpool"; and (5) a "massager".

(x)   On June 7, 2020, an Insured named JE was purportedly involved in a motor vehicle accident.  After a purported initial examination and prolong service outcome assessment of JE, Dr. Greco purportedly issued a prescription in JE's name on June 9, 2020 for the following Fraudulent Equipment: (1) a "cervical collar"; (2) "LSO lumbar support"; (3) a "bed board"; (4) a "cervical pillow"; (5) a "dry pressure mattress"; (6) a "back massager"; and

(7) a "water circulating w/pad w/ pump". Thereafter, on July 9, 2020, a prescription was issued in JE's name for the following Fraudulent Equipment: (1) a "cervical traction w/ pump"; (2) an "infrared heating lamp"; (3) a "lumbar traction w/ pump"; and (iv) a "whirlpool".

141.   This is only a representative sample. In fact, virtually all the Insureds identified in Exhibit "1" who received treatment at the Westchester Avenue Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

142.   Despite issuing multiple prescriptions for Fraudulent Equipment, the Prescribing Practitioners associated with the Westchester Clinic, including Dr. Greco, almost never referenced such prescriptions in contemporaneously dated medical records, such as initial and follow-up examination reports.

143.   Additionally, as part of the fraudulent scheme at the Westchester Avenue Clinic, the prescriptions for Fraudulent Equipment issued by the Prescribing Practitioners were never given to the Insureds. Rather, at the direction of the Clinic Controllers, the prescriptions were routed directly to the DME Defendants to ensure that the Fraudulent Equipment would be dispensed and billed to GEICO through Marta Medical.

144.   Thereafter, the DME Defendants delivered the Fraudulent Equipment to the No-Fault Clinics where the staff dispensed the DME and OD to Insureds without any interaction or instruction concerning their use from either the DME Defendants or the Prescribing Practitioner.

**2)    The Predetermined Fraudulent Protocol at the East 180th Street Clinic**

145.   The DME Defendants conspired with the Clinic Controllers at the East 180th Street Clinic to obtain prescriptions for medically unnecessary Fraudulent DME and OD from Prescribing Practitioners at the Clinic pursuant to a predetermined fraudulent protocol and unlawful financial arrangements.

146.    Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all the Insureds who treated with Healthway Medical at the East 180th Street Clinic were purportedly provided with an initial evaluation from a healthcare provider associated with Healthway Medical, including Maria Ciechorska, M.D. ("Dr. Ciechorska").

147.    Thereafter, each of the Insureds were purportedly prescribed DME and/or OD by a healthcare provider associated with Healthway Medical, including Dr. Ciechorska.

148.    Virtually every Insured who underwent an initial examination was issued a prescription for virtually the same type of Fraudulent Equipment, on the same date of their initial evaluation or on a date soon thereafter.

149.    Regardless of the Insureds' age, physical condition, or the severity of the Insured's injury – or lack thereof – after a purported initial examination a healthcare provider associated with Healthway Medical at the East 180th Street Clinic, including Dr. Ciechorska, would prescribe, at minimum, the following Fraudulent Equipment: (i) an "orthopedic pillow"; (ii) a "thermophore"; (iii) an "orthopedic bed"; and (iv) an "egg crate mattress".

150.    An Insured who continued to treat with Healthway Medical at the East 180th Street Clinic would virtually always be provided with an additional prescription for DME and/or OD.

151.    Regardless of an Insured's age, physical condition, or the severity of the Insured's injury – or lack thereof – an Insured who continued treatment with Healthway Medical at the East 180th Street Clinic, would virtually always receive a second prescription for DME and/or OD which included the following Fraudulent Equipment: (i) an "EMS unit- kit"; (ii) an "EMS placement belt"; (iii) an "infrared lamp"; and (iv) a "whirlpool". At times this prescription also included a prescription for a "massager".

152.   In addition to the items, an Insured who continued to treat with Healthway Medical at the East 180th Street Clinic would also receive an additional prescription for a "cervical traction" and/or a "custom orthotic".

153.   The prescriptions issued through Healthway Medical at the East 180th Street were often undated.

154.   Examples of the predetermined fraudulent prescription protocol implemented by the 180th Street Clinic and which resulted in claims for reimbursement submitted to GEICO by the DME Defendants, include the following:

(i)    On August 6, 2020, an Insured named MN was purportedly involved in a motor vehicle accident. After an initial evaluation of MN, Dr. Ciechorska issued a prescription in MN's name on August 12, 2020 for the following Fraudulent Equipment: (1) a "cervical collar soft"; (2) an "orthopedic pillow"; (3) a "thermophore"; (4) a "lumbosacral orthosis"; (5) an "orthopedic car seat"; (6) an "orthopedic bed board"; (7) an "eggcrate mattress"; and (8) an "orthopedic ankle support- L-XL". Then, on September 17, 2020, a second prescription was issued in MN's name for the following Fraudulent Equipment: (1) an "EMS unit + kit"; (2) an "EMS placement belt"; (3) an "electric massager"; (4) an "infrared heat lamp"; and (5) a "hydrotherapy whirlpool".

(ii)   On August 28, 2020, an Insured named AGD was purportedly involved in a motor vehicle accident.  Although AGD began treating with Healthway Medical at the East 180th Street Clinic on September 4, 2020, Dr. Ciechorska purportedly issued a prescription on September 3, 2020 in AGD's name for the following Fraudulent Equipment:  (1) a "cervical collar soft"; (2) an "orthopedic pillow"; (3) a "thermophore"; (4) a "lumbosacral orthosis"; (5) an "orthopedic bed board"; (6) an "eggcrate mattress"; and (8) an "orthopedic knee support".  Then, on October 13, 2020, Marta Medical provided Fraudulent Equipment pursuant to an undated prescription issued in AGD's name for a "custom knee support- R Knee". Then, although it does not appear AGD treated with Healthway Medical at the 180th Street Clinic on July 19, 2020 a prescription was issued on this date for the following Fraudulent Equipment: (1) an "EMS unit + kit"; (2) an "EMS placement belt"; (3) an "electric massager"; (4) an "infrared heat lamp"; and (5) a "hydrotherapy whirlpool".  Thereafter, on December 17, 2020, Marta Medical provided Fraudulent Equipment pursuant to an undated prescription issued in AGD's name for an "LSO custom L spine".

(iii)   On May 6, 2020, an Insured named FM was purportedly involved in a motor vehicle accident.   After an initial evaluation, Dr. Ciechorska issued a prescription on May 11, 2020 in FM's name for the following Fraudulent Equipment: (1) a "cervical collar soft"; (2) an "orthopedic pillow"; (3) a "thermophore"; (4) a "lumbosacral orthosis"; (5) a "lumbar cushion"; (6) an "orthopedic car seat"; (7) an "orthopedic bed board"; (6) an "eggcrate mattress"; and (8) an "orthopedic shoulder support".   Then, on June 29, 2020, Marta Medical provided Fraudulent Equipment pursuant to two separate undated prescriptions for a "C-traction C-spine" and a "LSO Custom L spine". Thereafter an additional prescription was issued on July 30, 2020 in FM's name for the following Fraudulent Equipment: (1) an "EMS unit + kit"; (2) an "EMS placement belt"; (3) an "electric massager"; (4) an "infrared heat lamp"; and (5) a "hydrotherapy whirlpool". Then, again on August 7, 2020, Marta Medical purportedly provided Fraudulent Equipment pursuant to an undated prescription issued in FM's name for a "custom shoulder support".

(iv)   On July 12, 2020, an Insured named LQ was purportedly involved in a motor vehicle accident.   After an initial evaluation on May 30, 2020, Dr. Ciechorska issued a prescription in LQ's name for the following Fraudulent Equipment: (1) an "orthopedic pillow"; (2) a "thermophore"; (3) a "lumbosacral orthosis"; (4) a "lumbar cushion"; (5) an "orthopedic bed board"; (6) an "eggcrate mattress"; (7) an "orthopedic knee support"; and (8) an "orthopedic ankle support". A second prescription was issued on August 25, 2020 in LQ's name for the following Fraudulent Equipment: (1) an "EMS unit + kit"; (2) an "EMS placement belt"; (3) an "electric massager"; (4) an "infrared heat lamp"; and (5) a "hydrotherapy whirlpool".

(v)   On July 16, 2020, an Insured named DL was purportedly involved in a motor vehicle accident. After an initial evaluation, Dr. Ciechorska purportedly issued a prescription on July 30, 2020 in DL's name for the following Fraudulent Equipment: (1) a "cervical collar soft"; (2) an "orthopedic pillow"; (3) a "thermophore"; (4) a "lumbosacral orthosis"; (5) a "lumbar cushion"; (6)  an "orthopedic car seat"; (7) an "orthopedic bed board"; (8) an "eggcrate mattress"; and (9) an "orthopedic shoulder support".   A second prescription was issued on August 25, 2020 in DL's name for the following Fraudulent Equipment: (1) an "EMS unit + kit"; (2) an "EMS placement belt"; (3) an "electric massager"; (4) an "infrared heat lamp"; and (5) a "hydrotherapy whirlpool". Thereafter, on August 26, 2020, Marta Medical provided Fraudulent Equipment pursuant to an undated prescription issued in DL's name for a "C- Traction C- Spine" and also provided  Fraudulent Equipment on September 29, 2020 pursuant to a second undated prescription for a "custom shoulder support R-Shoulder".

(vi)   On July 3, 2020, an Insured named FC was purportedly involved in a motor vehicle accident.   After an initial evaluation of FC, Dr. Ciechorska purportedly issued a prescription in FC's name on July 13, 2020 for the

following Fraudulent Equipment: (1) a "cervical collar soft"; (2) an "orthopedic pillow"; (3) a "thermophore"; (4) a "lumbosacral orthosis"; (5) a "lumbar cushion"; (6) an "orthopedic bed board"; and (7) an "eggcrate mattress". Thereafter, on August 19, 2020, a prescription was issued in FC's name for the following Fraudulent Equipment: (1) an "EMS unit + kit"; (2) an "EMS placement belt"; (3) an "electric massager"; (4) an "infrared heat lamp"; and (5) a "hydrotherapy whirlpool". Then, on August 20, 2020, Marta Medical provided Fraudulent Equipment pursuant to an undated prescription in FC's name for a "C Traction C Spine".

(vii)    On July 3, 2020, an Insured named RRP was purportedly involved in a motor vehicle accident. After an initial evaluation of RRP, Dr. Ciechorska issued a prescription in RRP's name on July 13, 2020 for the following Fraudulent Equipment: (1) a "cervical collar soft"; (2) an "orthopedic pillow"; (3) a "thermophore"; (4) a "lumbosacral orthosis"; (5) a "lumbar cushion"; (6) an "orthopedic bed board"; (7) an "eggcrate mattress"; and (8) an "orthopedic car seat". Then, on August 19, 2020, a prescription was issued in RRP's name for the following Fraudulent Equipment: (1) an "EMS unit + kit"; (2) an "EMS placement belt"; (3) an "electric massager"; (4) an "infrared heat lamp"; and (5) a "hydrotherapy whirlpool".

(viii)   On July 18, 2020, an Insured named DCM was purportedly involved in a motor vehicle accident. After an initial examination of DCM on August 5, 2020, Dr. Ciechorska issued a prescription in DCM's name for the following Fraudulent Equipment: (1) a "cervical collar soft; (2) an "orthopedic pillow"; (3) a "thermophore"; (4) a "lumbosacral orthosis"; (5) a "lumbar cushion"; (6) an "orthopedic bed board"; (7) an "eggcrate mattress"; (8) an "orthopedic ankle support"; and (9) an "orthopedic shoulder support". Then, on September 10, 2020, a prescription was issued in DCM's name for the following Fraudulent Equipment: (1) an "EMS unit + kit"; (2) an "EMS placement belt"; (3) an "electric massager"; (4) an "infrared heat lamp"; and (5) a "hydrotherapy whirlpool". Thereafter, on October 5, 2020, Marta Medical provided Fraudulent Equipment pursuant to an undated prescription in DCM's name for a "C traction C-Spine" and provide Fraudulent Equipment again on November 11, 2020 pursuant to an undated prescription for a "custom shoulder support".

(ix)     On July 7, 2020, an Insured named HG was purportedly involved in a motor vehicle accident. After an initial examination of HG, Dr. Ciechorska issued a prescription in HG's name on July 13, 2020 for the following Fraudulent Equipment: (1) a "cervical collar soft"; (2) an "orthopedic pillow"; (3) a "thermophore"; (4) an "orthopedic car seat"; (5) an "orthopedic bed board"; (6) an "eggcrate mattress"; and (7) an "orthopedic shoulder support". A line was drawn across the terms "lumbosacral orthosi" and "lumbar cushion", with a note stating "pt has already" on this same prescription. A second prescription was then issued on August 20, 2020 in HG's name for the following Fraudulent Equipment: (1) an "EMS unit + kit"; (2) an "EMS

placement belt"; (3) an "electric massager"; (4) an "infrared heat lamp"; and (5) a "hydrotherapy whirlpool". Thereafter, on October 5, 2020, Marta Medical provided Fraudulent Equipment pursuant to an undated prescription issued in HG's name for a "custom shoulder support R shoulder".

(x)     On June 13, 2020, an insured named AP was purportedly involved in a motor vehicle accident. After an initial examination of AP, Dr. Ciechorska issued a prescription on July 6, 2020 in AP's name for the following Fraudulent Equipment: (1) a "cervical collar soft"; (2) an "orthopedic pillow"; (3) a "thermophore"; (4) a "lumbosacral orthosis"; (5) a "lumbar cushion"; (6) an "orthopedic car seat"; (5) an "orthopedic bed board"; (6) an "eggcrate mattress"; and (7) an "orthopedic knee support".

155.    This is only a representative sample. In fact, virtually all of the Insureds identified in Exhibit "1" who received treatment with Healthway Medical at the East 180th Street Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

156.    Even more and keeping with the fact that the prescriptions purportedly issued by the Prescribing Practitioners were not medically necessary, the follow-up examination reports generated by Dr. Ciechorska and other healthcare providers associated with Healthway Medical at the East 180th Street Clinic rarely referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of the previously prescribed Fraudulent Equipment.

157.    Additionally, as part of the fraudulent scheme at the East 180th Street Clinic, the prescriptions for Fraudulent Equipment issued by Dr. Ciechorska and other Prescribing Practitioners were virtually never given to the Insureds. Rather, at the direction of the Clinic Controllers, the prescriptions were routed directly to the DME Defendants to ensure that the Fraudulent Equipment would be dispensed and billed to GEICO through Marta Medical.

158.    Thereafter, the DME Defendants delivered the Fraudulent Equipment to the No-Fault Clinics where the staff dispensed the DME and OD to Insureds without any interaction with

or instruction concerning their use from either the DME Defendants or the Prescribing Practitioner.

### 3)   The Predetermined Fraudulent Protocol at the Avenue V Clinic

159.   The DME Defendants conspired with the Clinic Controllers at the Avenue V Clinic to obtain prescriptions for medically unnecessary DME and OD from Prescribing Practitioners, including Dr. Rehman, at the No-Fault Clinic pursuant to a predetermined fraudulent protocol and unlawful financial arrangements.

160.   Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all the Insureds who received treatment with Apex Medical at the Avenue V Clinic were purportedly provided with an initial evaluation.

161.   Then, typically on the same date of the initial evaluation, each of the Insureds were purportedly prescribed DME and/or OD by Dr. Rehman or a Prescribing Practitioner affiliated with Apex Medical at the Avenue V Clinic.

162.   Virtually every Insured who underwent an initial examination was issued a prescription for virtually the same type of DME and OD on the same date as their initial evaluation.

163.   Regardless of the Insureds' age, physical condition, or the severity of the Insured's injury – or lack thereof – after a purported initial examination Dr. Rehman or a Prescribing Practitioner associated with Apex Medical at the Avenue V Clinic would prescribe, at minimum, the following Fraudulent Equipment to virtually every Insured:(i) a "lumbar sacral orthosis"; (ii) a "cervical collar- semi rigid"; and (iii) a "bed board".  At times, these prescriptions also included a prescription for a "lumbar back cushion" and/or "egg crate mattress".

164.   Regardless of an Insured's age, physical condition, or the severity of the Insured's injury – or lack thereof – an insured who continued treatment with the Avenue V Clinic, would

virtually always receive an additional prescription for DME and/or OD which included, at minimum, the following Fraudulent Equipment: (i) an "EMS Unit + lead"; (ii) an "infrared heat lamp"; and (iii) a "whirlpool".   At times, these prescriptions would also include a prescription for a "massager".

165.   In addition to the items, a Prescribing Practitioner associated with Apex Medical would also issue a prescription for a custom orthotic.

166.   In keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to Insureds were medically unnecessary and were provided to the DME Defendants pursuant to a predetermined fraudulent protocol, prescriptions were frequently dated on days on which the Insureds were not examined or otherwise treated at Apex Medical at the Avenue V Clinic.

167.   Furthermore, some Insureds received prescriptions prior to ever being evaluated and/or treated with a Prescribing Practitioner.

168.   Examples of the predetermined fraudulent prescription protocol implemented by the Avenue V Clinic and which resulted in claims for reimbursement submitted to GEICO by the DME Defendants, include the following:

> (i)   On May 6, 2020, an insured named ET was purportedly involved in a motor vehicle accident. Although it does not appear ET treated with Apex Medical on May 27, 2020, Dr. Rehman issued a prescription in ET's name on this date for the following Fraudulent Equipment: (1) an "EMS Unit 4 lead"; (2) a "massager"; (3) an "infrared heat lamp"; and (4) a "whirlpool".   Then, again, although it does not appear that ET treated with Apex Medical on June 4, 2020, a prescription was issued in ET's name on this date for a "cervical traction w/pump MRI".   Then, on June 11, 2020, a prescription was issued in ET's name for a "lumbar sacral orthosis MRI".   In keeping with the fraudulent prescription scheme at the Avenue V Clinic, a prescription was also issued on May 11, 2020 in ET's name, which was filled by a supplier of DME and OD other than Marta Medical for the following Fraudulent Equipment:   (1) a "lumbar sacral orthosis"; (2) a "cervical collar, semi rigid"; (3) an "egg crate mattress"; (4) a "bed board";

(5) a "heating pad"; (6) an "orthopedic car seat"; (7) "shoulder support"; and (8) a "cervical pillow".

(ii)     On May 6, 2020, an insured named AP was purportedly involved in a motor vehicle accident.  Although it appears  AP did not treat with Apex Medical at the Avenue V Clinic on June 9, 2020, Dr. Rehman issued a prescription on this date in AP's name for a "lumbar sacral orthosis- MRI".  In keeping with the fraudulent prescription scheme at the Avenue V Clinic, several prescriptions were issued in the name of AP and filled by suppliers of DME and OD other than Marta Medical including: (1) a prescription issued on May 11, 2020 for  a "lumbar sacral orthosis", a "lumbar back cushion", a "cervical collar semi rigid", an "egg crate mattress"; a "bed board", a "heating pad", and a "cervical pillow"; (2) a prescription issued on May 27, 2019, a date on which it does not appear AP treated with Apex Medical, for an "EMS Unit 4 Lead", a "massager", an "infrared heat lamp", and a "whirlpool"; (3) a prescription issued on June 4, 2020 for a "shoulder elbow wrist orthosis"; and (4) a prescription issued on June 4, 2020 for a "cervical traction w/pump MRI".

(iii)    On May 27, 2020, an insured named RS was purportedly involved in a motor vehicle accident. After an initial evaluation of RS on May 28, 2020, Dr. Rehman  issued a prescription in RS' name for the following Fraudulent Equipment: (1) a "lumbar sacral orthosis"; (2) a "lumbar back cushion"; (3) a "cervical collar, semi rigid"; (4) an "egg crate mattress"; (5) a "bed board"; (6) an "orthopedic car seat"; and (7) a "cervical pillow".  A second prescription was issued on June 11, 20202 in RS' name for the following Fraudulent Equipment: (1) an "EMS unit 4 lead"; (2) a "massager"; (3) an "infrared heat lamp"; and (4) a "whirlpool". Then, on June 24, 2020, a prescription was issued in RS' name for a "shoulder elbow wrist orthosis" and  a second prescription for a "knee orthosis fitted-left".

(iv)    On June 13, 2020 an insured named YJ was purportedly involved in a motor vehicle accident. Although YJ did not treat with Apex Medical at the Avenue V Clinic on June 18, 2020, June 30, 2020 or July 6, 2020, Dr. Rehman issued prescriptions in YJ's name on these dates.  On June 18, 2020, a prescription was issued for the following Fraudulent Equipment: (1) a "lumbar sacral orthosis"; (2) a "bed board"; (3) an "orthopedic car seat"; (4) a "cervical pillow"; and (5) a "heating pad". On June 11, 2020, a prescription was issued for the following Fraudulent Equipment: (1) an "EMS unit + lead"; (2) a "massager"; (3) an "infrared heat lamp"; and (4) a "whirlpool".  Then, on June 29, 2020, a prescription was issued for a "knee orthosis fitted".

(v)     On June 13, 2020, an insured named FJ was purportedly involved in a motor vehicle accident. Although FJ did not begin treating with Apex Medical at the Avenue V Clinic until June 17, 2020, a prescription was issued on June 15, 2020 in FJ's name for the following Fraudulent Equipment: (1) a "lumbar sacral orthosis"; (2) a "lumbar back cushion"; (3) a "cervical collar

semi-rigid"; (4) a "cervical traction w/pump MRI"; (5) an "egg crate mattress"; (6) a "bed board"; (7) a "heating pad"; (8) "knee support"; and (9) a "cervical pillow". Then, although it does not appear FJ treated with Apex Medical at the Avenue V Clinic on June 30, 2020, a prescription was issued in FJ's name on this date for the following Fraudulent Equipment: (1) an "EMS Unit 4 Lead"; (2) a" massager"; (3) an "infrared heat lamp"; and (4) a "whirlpool". Then, on July 7, 2020, Marta Medical provided Fraudulent Equipment pursuant to an undated prescription issued in FJ's name for a "shoulder elbow wrist orthosis-left".

(vi)     On March 18, 2020, an insured named MM was purportedly involved in a motor vehicle accident.  On May 26, 2020, Dr. Rehman issued a prescription for a "lumbar sacral orthosis MRI".  In keeping with the fraudulent prescription protocol at the Avenue V Clinic, the following prescriptions were also issued: (1) a prescription was issued on April 1, 2020 following an initial examination for  a "lumbar sacral orthosis", a "lumbar back cushion"; a "cervical collar – semi rigid"; an "egg crate mattress"; a "bed board", and "knee support- t/l"; (2) a prescription was issued on April 20, 2020, a date on which MM did not treat at the Clinic, for a  an "EMS Unit 4 Lead", a "massager", an "infrared heat lamp", and a "whirlpool"; and (3) a prescription was issued in MM's name on April 21, 2020 for a "shoulder orthosis-right", which was also purportedly provide by a supplier of DME and OD other than Marta Medical.

(vii)    On June 4, 2020, an insured named TB was purportedly involved in a motor vehicle accident.  On June 26, 2020, Marta Medical provided the following Fraudulent Equipment pursuant to an undated prescription issued by Dr. Rehman: (1) "TLSO back support"; (2) a "lumbar back cushion"; (3) a "cervical collar- semi rigid"; (4) an "egg crate mattress"; (5) a "bed board"; (6) a "heating pad"; (7) "knee support- right"; and (8) a "cervical pillow". A prescription was issued on June 18, 2020 for the following Fraudulent Equipment: (1) an "EMS Unit 4 Lead"; (2) a "massager"; (3) an "infrared heat lamp"; and (4) a "whirlpool".  Dr. Rehman then issued a nearly identical prescription on July 8, 2020 in TB's name, a date on which TB did not treat with Apex Medical for the following Fraudulent Equipment which was provided by a supplier of DME and OD Equipment other than Marta Medical: (1) a "massager"; (2) a "whirlpool"; (3) an "infrared heat lamp"; and (4) a "TENS EMS".

(viii)   On June 5, 2020, an insured name SG was involved in a motor vehicle accident.  On June 11, 2020, Dr. Rehman issued a prescription in SG's name for the following Fraudulent Equipment: (1) "TLSO back support"; (2) a "lumbar sacral orthosis"; (3) a "lumbar back cushion"; (4) a "cervical collar- semi rigid"; (5) an "egg crate mattress";  (6) a "bed board"; (7) an "orthopedic car seat"; and (8) a "cervical pillow". Then, although it does not appear that SG treated with Apex Medical at the Avenue V Clinic on June 24 2020, a prescription was issued on this date in SG's name for the

following Fraudulent Equipment: (1) an "EMS unit 4 lead"; (2) a "massager"; (3) an "infrared heat lamp"; and (4) a "whirlpool".

(ix)   On May 6, 2020, an insured named JT was involved in a motor vehicle accident.  On June 9, 2020, Dr. Rehman issued a prescription in JT's name for a "lumbar sacral orthosis:" In keeping with the fraudulent prescription protocol at the Avenue V Clinic, the following prescriptions were also issued and filled by suppliers of DME and OD other than Marta Medical: (1) a prescription was issued on May 11, 2020 for a "lumbar sacral orthosis"; a "lumbar back cushion"; a "cervical collar-rigid"; an "egg crate mattress"; a "bed board"; a "heating pad"; an "orthopedic car seat"; "shoulder support"; and a "cervical pillow"; (2) a prescription was issued on May 27, 2020 for an "EMS Unit 4 Lead", a "massager", an "infrared heat lamp", and a "whirlpool"; and  (3) two prescriptions issued on June 4, 2020 for a "cervical traction w/pump w/mri" and "shoulder elbow wrist orthosis- right"

(x)   On March 13, 2020, an insured named DJ was involved in a motor vehicle accident. On June 4, 2020, Dr. Rehman issued a prescription in DJ's name for a "lumbar sacral orthosis MRI" which was provided by the DME Defendants.  In keeping with the fraudulent prescription protocol at the Avenue V Clinic, the following prescriptions were issued and filled by a supplier of DME other than Marta Medical: (1) a prescription was issued on April 1, 2020 for a "lumbar sacral orthosis", a "lumbar back cushion", a "cervical collar- semi rigid", an "egg crate mattress", a "bed board", and "knee support"; (2) a prescription was issued on April 20, 2020, a date on which DJ did not treat with Apex Medical at the Avenue V Clinic, for an "EMS unit 4 lead", a "massager", an "infrared heat lamp", and a "whirlpool"; (3) a prescription issued on May 11, 2020 for a "cervical traction with pump MRI"; and (4) a prescription issued on April 21, 2020 for a "shoulder orthosis- right".

169.   These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" who received treatment at the Avenue V Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

170.   In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Avenue V Clinic were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneous dated medical records, such as an initial examination report or a follow-up examination report, virtually never fully

identified the Fraudulent Equipment purportedly prescribed to the Insureds or explained why the healthcare provider prescribed any of the Fraudulent Equipment.

171.   Even more and keeping with the fact that the prescriptions purportedly issued by the Prescribing Practitioners were not medically necessary, the follow-up examination reports generated by Dr. Rehman and other healthcare providers associated with Apex Medical at the Avenue V Clinic rarely referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication as whether to the Insured should continue using any of previously prescribed Fraudulent Equipment.

172.   Additionally, as part of the fraudulent scheme at the Avenue V Clinic, the prescriptions for Fraudulent Equipment issued by Dr. Rehman and other Prescribing Practitioners were virtually never given to the Insureds. Rather, at the direction of the Clinic Controllers, the prescriptions were routed directly to the DME Defendants to ensure that the Fraudulent Equipment would be dispensed and billed to GEICO through Marta Medical.

173.   Thereafter, the DME Defendants delivered the Fraudulent Equipment to the No-Fault Clinics where the staff dispensed the DME and OD to Insureds without any interaction with or instruction concerning their use from either the DME Defendants, Dr. Rehman, or any healthcare provider associated with the Avenue V Clinic.

**E.     The Unlawful Distribution of Fraudulent Equipment to Insureds by the Defendants Without Valid Prescriptions**

174.   The Prescribing Practitioners routinely issued vague and generic prescriptions for DME and OD to Insureds.

175.   More specifically, these prescriptions did not include a corresponding HCPCS Code for the DME and/or OD to be provided to the Insured nor did they provide sufficient detail to indicate the type of DME and/or OD to be provided to the Insured.

176.   As part of their scheme, the Prescribing Practitioners and the DME Defendants intentionally employed pre-printed checklists and forms, which contained generic descriptions for DME and OD.

177.   These checklists virtually never included a corresponding HCPCS code to specifically identify the type of DME or OD equipment prescribed.

178.   In keeping with the fact that the Prescribing Practitioners issued prescriptions based on a fraudulent prescription protocol rather than issuing items which were medically necessary, the type of checklist employed varied depending on whether it was the Insured's first, second, or third prescription for DME and/or OD Equipment.

179.   For example:

(i)   The Prescribing Practitioners at the Westchester Avenue Clinic employed the following checklist when issuing the first prescription for DME and/or OD to the Insureds identified in Exhibit "1":



**Durable Medical Equipment Prescription**

1. Cervical Collar___
2. LSO Lumbar Support___
3. Knee Orthosis, Elastic (R/L) ___
4. Ankle Food Orthosis Adjustable___
5. Wrist Support (R/L) ___
6. Bed Board ___
7. Cervical Pillow ___
8. Dry Pressure Mattress ___
9. Back Massager___
10. Car Seat Support/Orthopedic___
11. Water Circulating Heat Pad W/Pump___
12. Thermophore/Heating Pad ___
13. Elbow Support (R/L) ___
14. Shoulder Support (R/L) ___

(ii)   The Prescribing Practitioners at the Westchester Avenue Clinic employed following checklist when issuing a second prescription for DME and/or OD to Insureds identified in Exhibit "1":

**Durable Medical Equipment Prescription**

1. Cervical Traction W/Pump ✓
2. Lumbar Traction W/Pump ✓
3. E.M.S. Unit___
4. E.M.S. Belt___
5. T.E.N.S Unit___
6. T.E.N.S. Belt___
7. Infrared Lamp ✓
8. Whirlpool ✓
9. Cold/Hot Pack___
10. Massager ✓
11. Cane___
12. Other_____

**Doctor's Notes:** Patient is to wear prescribed **Durable Medical Equipment:**

| ___x Per Week | ___5x Per Week | ___To and From Work | ___At Work |
|---|---|---|---|
| 10-20 Minutes Daily | 2-3 Hours/ Day | 3-6 Hours /Day | 6-12 Hours/ Day |

(iii)   The Prescribing Practitioners at the Westchester Avenue Clinic employed the following checklist when issuing a third prescription for DME and/or OD to Insureds identified in Exhibit "1":

**Durable Medical Equipment Prescription**

✓ Cervical Traction

___LSO W/APL Control Fitted/ADJ

___K.O. Adjustable Knee joints ridgid

**Doctor's Notes:** Patient is to wear prescribed Durable Medical Equipment:

| ___x per week | ✓ x per week | To and From Work | At Work |
|---|---|---|---|
| 10-20 Minutes Daily | 2-3 Hours/day | 3-6 Hours/day | 6-12 Hours/day |

For a period of 4-6 weeks, reevaluation at that time

180.   As a further example, Dr Ciechorska and other the Prescribing Practitioners at the East 180th Street Clinic employed a checklist listing general and vague descriptions of DME and OD.

181.   Additionally, the Prescribing Practitioners associated with the East 180th Street Clinic also employed pre-printed prescriptions which listed general and vague descriptions of OD Equipment, when such Fraudulent Equipment was prescribed to an Insured.

182.   The Prescriptions used by the Prescribing Practitioners at the East 180th Street Clinic virtually never listed corresponding HCPCS Codes to identify the specific type of DME and/or OD Equipment.

183.   For example:

    (i)    Prescribing Practitioners associated with Healthway Medical at the East 180th Street Clinic would typically employ the following checklist to issue prescriptions to Insureds identified in Exhibit "1":

| | |
|---|---|
| ( ) Cervical collar soft | ( ) EMS unit + kit |
| ( ) Cervical Traction with Pump | ( ) EMS Placement Belt |
| ( ) Orthopedic Pillow | ( ) Electric Massager |
| ( ) Thermophore | ( ) Orthopedic Elbow Support  L R (S)(M) (L)(XL) |
| ( ) Lumbosacral Orthosi | ( ) Orthopedic Knee Support  L R (S)(M)(L)(XL) |
| ( ) Lumbar cushion | ( ) Orthopedic Ankle Support L  R (S)(M)(L)(XL) |
| ( ) Orthopedic Car Seat | ( ) Orthopedic Wrist Support  L  R (S)(M)(L)(XL) |
| ( ) Orhtopedic Bed Board | ( ) Orthopedic Shoulder Support L (R)(S)(M)(L)(XL) |
| ( ) Eggcrate Mattress | ( ) Infrared Heat Lamp |
| ( ) Hot/Cold Pack | ( ) Hydrotherapy whirlpool |
| ( ) Water Circ. Heat/Cold Pad Pump | ( ) Crutches |
| ( ) Cane | |

    (ii)    The Prescribing Practitioners affiliated with the 180th Street Clinic would also employ the following pre-printed, pre-filled prescription form to issue prescriptions for OD to insureds identified in Exhibit "1":

Custom Shoulder Support

R/O:

Indications:

Doctor's Signature:



184.   As a further example the Prescribing Practitioners at the Avenue V Clinic employed a checklist listing general and vague descriptions of DME and OD.

185.   The Prescriptions used by the Prescribing Practitioners at the Avenue V Clinic virtually never listed corresponding HCPCS Codes to identify the specific type of DME and/or OD to be provided to an Insured.

186.   For example, the Prescribing Practitioners at the Avenue V Clinic would typically employ the following checklist to issue prescriptions to Insureds:



187.   The prescriptions provided to Insureds were invalid since the prescriptions did not indicate with specificity the type of DME and/or OD to be provided to Insureds.

188.   Nonetheless, despite this the DME Defendants routinely purported to provide DME and OD based on the prescriptions issued by the Prescribing Practitioners without seeking any clarification as to the type of DME and/or OD that was to be provided to Insureds.

189.   Even more, Marta Medical was not properly licensed to distribute DME and OD to any Insureds nor was Zubchenko a licensed medical professional.   Therefore, the DME Defendants were not lawfully permitted to dispense any DME or OD to Insureds, let alone designate which specific types of DME or OD to dispense pursuant to  the aforementioned prescriptions.

190.   However, in virtually all of the claims identified in Exhibit "1"the DME Defendants improperly provided DME and OD without first having valid prescriptions issued by a licensed medical professional.

191.   In fact, the DME Defendants purported to provide Insureds with DME and OD which had higher permissible reimbursement rates than other items.

192.   For example, many of the prescriptions that were submitted by the DME Defendants to support the charges identified in Exhibit "1" contained a vague description of a "lumbosacral orthosis", "lumbar sacral orthosis" or "LSO lumbar support".  However, this vague and generic language directly relates to the over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, including:

    (i)    HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $43.27.

    (ii)    HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but is customizable to fit a specific patient, which has a maximum reimbursement rate of $61.25.

    (iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels which is prefabricated but customizable to fit a specific patient, which has a maximum reimbursement rate of $322.98.

    (iv)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $65.92.

    (v)    HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)     HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but is customizable to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)    HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customizable to fit a specific patient, which has a maximum reimbursement rate of $806.64.

(viii)   HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $ 1150.00.

(ix)     HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customizable to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)      HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)     HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)    HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xiii)   HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customizable to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)    HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xv)     HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customizable to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)    HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)   HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii) HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix) HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which a maximum reimbursement rate of $111.80.  see below--- why??

(xx) HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi) HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii) HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

193.   The DME Defendants are not healthcare providers licensed to issue prescriptions for DME or OD, and they were not legally permitted to determine which of the above-available options were best suited for each Insured.

194.   In fact, in virtually every instance where the DME Defendants received a prescription from the Prescribing Practitioner for a "lumbosacral orthosis", "lumbar sacral orthosis" or "LSO lumbar support", the DME Defendants billed GEICO using HCPCS Code L0634 requesting a reimbursement of $759.92, and thereby asserted that they provided the Insureds with that specific item, which resulted in inflated charges to GEICO.

195.   As a further example, many of the prescriptions that were used by the DME Defendants to support the charges identified in Exhibit "1" contained a vague description of "TLSO back support".  However, this vague and generic language directly relates to the over 20

different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, including:

(i)      HCPCS Code L0455, a flexible TLSO device that provides trunk support, is prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $239.42;

(ii)     HCPCS Code L0456, a flexible TLSO device that provides trunk support, thoracic region, rigid posterior panel and soft anterior apron, that is prefabricated but otherwise customizable, which has a maximum reimbursement rate of $778.11;

(iii)    HCPCS Code L0457, a flexible TLSO device that provides trunk support, thoracic region, rigid posterior panel and soft anterior apron, that is prefabricated but otherwise customizable, which has a maximum reimbursement rate of $686.57;

(iv)    HCPCS Code L0458, a TLSO device with triplane control, modular segmented spinal system, with two plastic shells, that is prefabricated but includes fitting and adjustments, which has a maximum reimbursement rate of $400.18;

(v)      HCPCS Code L0460 a TLSO device with triplanar control, modular segmented spinal system, that is prefabricated but otherwise customizable, which has a maximum reimbursement rate of $400.18;

(vi)    HCPCS Code L0462, a TLSO device with triplanar control, modular segmented spinal system, three rigid plastic shells, that is prefabricated but includes fitting and adjustment, which has a maximum reimbursement rate of $400.18;

(vii)   HCPCS Code L0467, a TLSO device with a rigid posterior frame that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $247.07;

(viii)  HCPCS Code L0468, a TLSO device with sagittal-coronal control, rigid posterior fame and flexible soft anterior apron with straps, that is prefabricated but customizable which has a maximum reimbursement rate of $343.54;

(ix)    HCPCS Code L0469 a TLSO device with sagittal-coronal control, rigid posterior frame and flexible soft anterior apron with straps, that is prefabricated and off-the shelf, which has a maximum reimbursement rate of $303.13;

(x)      HCPCS Code L0470, a TLSO made of a rigid posterior frame and flexible soft anterior apron with rotational strength provided by subclavicular

extensions that is prefabricated, which has a maximum reimbursement rate of $402.39;

(xi)   HCPCS Code L0472 a TLSO device with hyperextension that is prefabricated with fitting and adjustment, which has a maximum reimbursement rate of $295.00; and

(xii)   HCPCS Code L0490 a TLSO device with sagittal-corona control, one piece rigid plastic shell, with overlapping reinforced anterior that is prefabricated but includes fitting and adjustments, which has a maximum reimbursement rate of $249.76.

196.   The DME Defendants are not healthcare providers licensed to issue prescriptions for DME or OD, and they were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a "TLSO back support".

197.   In fact, each and every time that the Defendants received a prescription from the Prescribing Practitioners for a "TLSO back support" the Defendants billed GEICO using HCPCS Code L0470 requesting a reimbursement of $402.39, and thereby asserted that they provided the Insureds with that specific item, which resulted in inflated charges to GEICO.

198.   Similarly, many of the prescriptions that were used by the Defendants to support the charges identified in Exhibit "1" contained a vague description of an "Orthopedic Knee Support" and "custom knee support".   However, this vague and generic language for a knee orthotic contained in the prescriptions directly relate to the over 15 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, including:

(i)   HCPCS Code L1810, a knee orthosis that is elastic with joints and that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $80.51;

(ii)   HCPCS Code L1812, a knee orthosis that is elastic with joints and that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $71.04;

(iii)   HCPCS Code L1820, a knee orthosis that is elastic with condylar pads and joints and that is prefabricated and includes fitting with adjustment, which has a maximum reimbursement rate of $110.00;

(iv)   HCPCS Code L1830, a knee orthosis that is immobilizing, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $65.00;

(v)   HCPCS Code L1831, a knee orthosis with a locking knee joint that is prefabricated, which has a maximum reimbursement rate of $208.13;

(vi)   HCPCS Code L1832, a knee orthosis that has adjustable knee joints, is prefabricated, and custom-fitted, which has a maximum reimbursement rate of $607.55;

(vii)   HCPCS Code L1833, a knee orthosis that has adjustable knee joints and that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $536.08;

(viii)   HCPCS Code L1834, a knee orthosis that is rigid, without a knee joint, and that is custom fabricated, which has a maximum reimbursement rate of $595.41;

(ix)   HCPCS Code L1836, a knee orthosis that is rigid, without a knee joint, and that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $104.84;

(x)   HCPCS Code L1840, a knee orthosis that is for derotation of anterior cruciate ligament and that is custom fabricated, which has a maximum reimbursement rate of $597.50;

(xi)   HCPCS Code L1843, a knee orthosis that extends from thigh to calf with adjustable flexion and extension joint and that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $634.53;

(xii)   HCPCS Code L1844, a knee orthosis that extends from thigh to calf with adjustable flexion and extension joint and that is custom fabricated, which has a maximum reimbursement rate of $1,107.70;

(xiii)   HCPCS Code L1845, a knee orthosis with a double upright that extends from thigh to calf with adjustable flexion and extension joint and that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $693.00;

(xiv)   HCPCS Code L1846, a knee orthosis with a double upright that extends from thigh to calf with adjustable flexion and extension joint and that is custom fabricated, which has a maximum reimbursement rate of $828.15;

59

(xv)    HCPCS Code L1847, a knee orthosis with a double upright with adjustable joint and inflatable air support chambers and that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $449.98;

(xvi)    HCPCS Code L1848, a knee orthosis with a double upright with adjustable joint and inflatable air support chambers and that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $397.04;

(xvii)    HCPCS Code L1850, a Swedish-type knee orthosis that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $185.00; and

(xviii)    HCPCS Code L1860, a knee orthosis with a modification of the supracondylar prosthetic socket that is custom fabricated, which has a maximum reimbursement rate of $617.00.

199.    The DME Defendants are not healthcare providers licensed to issue prescriptions for DME or OD, and they were not legally permitted to determine which of the above-available options were best suited for each Insured that had a prescription for a "orthopedic knee support" or "knee support".

200.    Rather than first clarifying the type of "orthopedic knee support" or "knee support" to be provided to an insured pursuant to a prescription issued by a Prescribing Practitioner listing these items, the DME Defendants billed GEICO for purportedly supplying the Insureds with a knee brace under HCPCS Code L1843 requesting a reimbursement of $634.53, which resulted in inflated charges to GEICO.

201.    These are only representative examples. The DME Defendants unlawfully dispensed the Fraudulent Equipment for virtually all of the claims identified in Exhibit "1" based on vague and generic prescriptions for DME and OD.

202.    In virtually all the claims identified in Exhibit "1" the Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so.

203.   However, the Fraudulent Equipment identified in Exhibit "1" was dispensed to Insureds as the result of decisions by the DME Defendants, who were not legally authorized to make such medical determinations. As a result, the Defendants were never eligible for reimbursement of No-Fault Benefits.

F.   **The Defendants' Fraudulent Billing for DME and/or OD**

204.   The DME Defendants submitted bills to GEICO and other New York automobile insurers misrepresented the type of DME and OD the DME Defendants provided to Insureds – to the extent that any DME and OD were actually provided to Insureds in the first instance.

205.   The DME Defendants further misrepresented that the items billed to GEICO were provided pursuant to valid prescriptions issued by Prescribing Practitioners authorized to do so, and that such items were medically necessary in the course of treatment.

206.   Moreover, and as explained below, the bills submitted to GEICO by the DME Defendants misrepresented that: (i) the Fee Schedule items dispensed matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

1)   **The Defendants' Fraudulently Misrepresented the Fee Schedule Items Purportedly Provided**

207.   The New York Fee Schedule provides that the Medicaid Fee Schedule is to be used to determine the cost for Fee Schedule DME and OD.  The Medicaid Fee Schedule specifically defines the requirements to bill for each HCPCS code.

208.   Additionally, Palmetto provides specific requirements that both fee schedule and non-fee schedule items must meet to qualify for reimbursement under a specific HCPCS code.

209.   The DME Defendants submitted bills with HCPCS codes, which identified the type of DME or OD that was purportedly provided to an Insured.

210.   However, with the exception of codes relating to cervical pillows under HCPCS Code E0190 and electric heating pads under HCPCS Code E0215, the DME Defendants falsely represented to GEICO that the HCPCS Codes listed in each bill submitted for reimbursement were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

211.   The Prescribing Practitioners virtually always issued prescriptions with vague and generic descriptions for DME and OD.   These prescriptions virtually never listed any corresponding HCPCS codes to identify the specific type of DME or OD to be provided.

212.   By contrast, the DME Defendants virtually always submitted bills to GEICO containing HCPCS codes for each DME and/or OD purportedly provided to Insureds pursuant to prescriptions issued by the Prescribing Practitioners.

213.   The DME Defendants submitted bills with HCPCS codes for DME and OD, which were among the higher priced and higher quality items included in the Fee Schedule.

214.   The Defendants did not in fact provide the items identified in the bills and paperwork submitted to GEICO.

215.   Instead, the Defendants provided DME and OD of lower price and inferior quality than the items identified in the bills and documents submitted to GEICO for reimbursement.

216.   The bills and documents the DME Defendants submitted to GEICO seeking reimbursement severely misrepresented the type of the DME and OD provided to Insureds in order to fraudulently maximize profits.

(a) The Fraudulent Billing submitted for Custom-Fitted OD

217.   For example, as set forth in Exhibit "1", the DME Defendants frequently submitted bills to GEICO for Fraudulent Equipment that was purportedly "custom fitted" for specific

Insureds when, in fact, the DME Defendants virtually never customized any of the DME or OD billed.

218.   As identified in the claims contained within Exhibit "1", in instances where the Prescribing Practitioners purportedly prescribed "lumbosacral orthosis", "lumbar sacral orthosis" or "LSO lumbar support", the DME Defendants purported to provide a Lumbar Sacral Orthotic or LSO and billed GEICO under HCPCS Code L0634 with a charge of $759.92 per unit.

219.   However, the bills submitted to GEICO listing HCPCS Code L0634 fraudulently misrepresented the type of Fraudulent Equipment the DME Defendants purportedly provided to Insureds and were thereby not reimbursable under HCPCS Code L0634.

220.   The product assigned to HCPCS Code L0634 is a back brace with rigid panels for the anterior and posterior parts of the lumbar spine that is customized to fit a specific patient by an individual with expertise.

221.   However, the specific lumbar orthotic actually provided by the DME Defendants – to the extent that the DME Defendants provided the Insureds with any lumbar orthotics – did not contain the requirements set forth in HCPCS Code L0634 because the items were never customized to fit each patient.

222.   Furthermore, as identified in the claims contained within Exhibit "1", in instances where the Prescribing Practitioners issued prescriptions for "LSO APL Control Fitted/adj" or "LSO custom fit" the DME Defendants purported to provide a "LSO Appl Control Custom Fitted" under HCPCS Code L0632 with a charge of $1,150.00

223.   However, the bills submitted to GEICO listing HCPCS Code L0632 fraudulently misrepresented the type of Fraudulent Equipment the DME Defendants purportedly provided to Insureds and were thereby not reimbursable under HCPCS Code L0632.

224.   The product assigned to HCPCS Code L0632 is a back brace with rigid panels for the anterior and posterior parts of the lumbar spine that has been custom fabricated, by an individual with expertise.

225.   However, the specific lumbar orthotic actually provided by the DME Defendants – to the extent that the DME Defendants provided the Insureds with any lumbar orthotics – did not contain the requirements set forth in HCPCS Code L0632 because the items were never customized to fit each patient.

226.   Similar to the fraudulent charges for customized lumbar orthotics under HCPCS L0634 and L0632, as identified in the claims contained within Exhibit "1", the DME Defendants used prescriptions from the Prescribing Practitioners to bill GEICO for knee orthotics that fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds.

227.   In instances where the Prescribing Practitioners issued prescriptions for an "orthopedic knee support" or "knee support", the DME Defendants purported to issue knee orthotics to Insureds under HCPCS Code L1843 with a charge of $634.53 per unit.

228.   However, the bills to GEICO for HCPCS Code L1843 fraudulently misrepresented the type of Fraudulent Equipment the DME Defendants purportedly provided to Insureds and thereby were not reimbursable under HCPCS Code L1843.

229.   The product assigned to HCPCS Code L1843 is a knee brace that has been customized to fit a specific patient by an individual with expertise.

230.   However, the specific knee orthotic actually provided by the DME Defendants – to the extent that the DME Defendants provided the Insureds with any knee orthotics – did not contain the requirements set forth in HCPCS Code L1843 because the items were never customized to fit each patient.

231.   The Defendants also used prescriptions for "shoulder support" or "orthopedic shoulder support" from the Prescribing Practitioners to bill GEICO for shoulder orthotics under HCPCS Code L3674 with a charge of $896.92 per unit.

232.   However, the bills to GEICO for HCPCS Code L3674 fraudulently misrepresented the type of Fraudulent Equipment the DME Defendants purportedly provided to Insureds and thereby were not reimbursable under HCPCS Code L3674.

233.   The product assigned to HCPCS Code L3674 is a shoulder support that has been customized to fit a specific patient by an individual with expertise.

234.   However, the specific shoulder orthotic actually provided by the DME Defendants – to the extent that the DME Defendants provided the Insureds with any shoulder orthotics – did not contain the requirements set forth in HCPCS Code L3674 because the items were never customized to fit each patient.

235.   In order to help clarify the term "custom fitted", Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

236.   One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for off-the-shelf orthotics, means that "the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has

specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

237.   By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

238.   In each of the claims identified within Exhibit "1" where the DME Defendants billed for custom fitted or custom fabricated Fraudulent Equipment under HCPCS Code L0634, L0632, L1843, and L3674 each of the bills fraudulently mispresented that the DME Defendants provided the Insureds with OD that was custom-fitted or custom fabricated, as defined by Palmetto, by a certified orthotist.

239.   Instead, to the extent that the DME Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for HCPCS Codes L0634, L0632, L1843, and L3674, the DME Defendants provided the OD without customizing the OD for the particular Insured.

240.    Indeed, OD billed under HCPCS Codes L0634, L0632, L1843, and L3674 were not actually custom fitted since Zubchenko is not a certified orthotist and is therefore not certified to customize any OD for any individual.

(b) The Fraudulent billing submitted for DME Equipment

241.    The Defendants also used the vague and generic language in the prescriptions to bill GEICO for DME Products listed in the Fee Schedule.

242.    For example, for the claims identified within Exhibit "1" where the Prescribing Practitioners prescribed either an "egg crate mattress" or a "dry pressure mattress" the DME Defendants would purport to provide Insureds with a Foam Rubber Mattress and bill GEICO under HCPCS Code E0272 for a charge of $155.52.

243.    However, instead of providing insureds with a foam or rubber mattress, the DME Defendants provided Insureds with mattress pads or toppers in the shape of egg crates.

244.    Mattress pads or toppers are referred to as "dry pressure pad for mattress, standard mattress length and width" in the Fee Schedule under HCPCS Code E0199 and have a maximum reimbursement rate of $19.48.

245.    In each of the claims identified within Exhibit "1" where the DME Defendants billed GEICO under HCPCS Code E0272, the DME Defendants misrepresented the type of DME provided to insureds pursuant to prescriptions for an "egg crate mattress" or "dry pressure mattress".

246.    As a further example, for the claims identified within Exhibit "1" where the Prescribing Practitioners prescribed either an "orthopedic bed board" or a "bed board" the DME Defendants purported to provide Insureds with a bed board and bill GEICO under HCPCS Code E0274 for a charge of $101.85.

247.    However, the product represented by HCPCS Code E0274 is defined as an over-bed table that is commonly used by patients to eat upon while relegated to a hospital bed.

248.    By contrast, upon information and belief, to the extent that the DME Defendants provided the Insureds with any equipment, the DME Defendants provided Insureds with a thin "board" to place on top of the Insureds' bedframes.

249.    Bed Boards are Non-Fee Schedule Items that are reimbursable at the lesser of: (i) the acquisition cost to the provider plus 50%; or (ii) the usual and customary price charge to the general public.

250.    As a further example, for the claims identified within Exhibit "1" where the Prescribing Practitioners prescribed either an "orthopedic pillow" or a "lumbar cushion" the DME Defendants purported to provide Insureds with a lumbar cushion and bill GEICO under HCPCS Code E2621 for a charge of $519.64.

251.    However, the product represented by HCPCS Code E2621 is defined as a positioning wheelchair back cushion, which were not provided to Insureds.

252.    The maximum reimbursement rate for a position pillow is $20.04 and billable under HCPCS Code E0190.

253.    In each of the claims identified within Exhibit "1" where the DME Defendants billed for Fraudulent Equipment under HCPCS Code E2621, each of the bills fraudulently misrepresented that the DME Defendants provided the Insureds with equipment in response to a prescription for a positioning wheelchair back cushion and that the item satisfies the requirements of HCPCS Code E2619.

254.    As a further example, the DME Defendants further misrepresented claims identified within Exhibit "1" where the Prescribing Practitioners prescribed "car seat support orthopedic", "orthopedic car seat", or "car seat".

255. Each of the claims identified within Exhibit "1" for HCPCS Code T5001 contained a charge for $756.03 based upon a prescription for a "Car Seat Support Orthopedic", "Orthopedic Car Seat", or "Car Seat".

256. However, the product represented by HCPCS Code T5001 is defined as a "positioning seat for persons with special orthopedic needs". This item is intended for individuals who need the assistance of a special seat in order to safely ride in a vehicle. For example, the individual needs a special seat as they cannot use the manufacturers seat belt to safely ride in the vehicle. HCPCS Code T5001 is not for the use of a cushion to have a more comfortable ride.

257. Despite billing GEICO using HCPCS Code T5001, the items provided by the DME Defendants – to the extent that the DME Defendants provided the Insureds with any item in response to the prescriptions for an orthopedic car seat – were not special seats for patients with special orthopedic needs as required by HCPCS Code T5001.

258. Upon information and belief, by contrast, they were cushions for the patients to place on top of the existing car seat. These cushions are Fee Schedule items that are listed under HCPCS Code E0190, which is defined as a "positioning cushion/pillow/wedge".

259. The Fee Schedule sets a maximum reimbursement rate of $20.04 for each positioning cushion under HCPCS Code E0199, well below the fraudulent charges submitted to GEICO by the Defendants seeking $195.00 for each orthopedic car seat billed under HCPCS Code T5001.

260. In each of the claims identified within Exhibit "1" where the DME Defendants billed for Fraudulent Equipment under HCPCS Code T5001, each of the bills fraudulently mispresented that the DME Defendants provided the Insureds with equipment in response to a prescription for Special Orthopedic Seat and that the item satisfies the requirements of HCPCS Code T5001.

261.   With the exception of the specific HCPCS Codes E0190 and E0215, in each of the claims for Fee Schedule items identified within Exhibit "1", to the extent that any Fraudulent Equipment was actually provided, the DME Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain.

### 2)   The Defendants Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

262.   When the DME Defendants submitted bills to GEICO for Non-Fee Schedule items the DME Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

263.   As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

264.   By submitting bills to GEICO for Non-Fee Schedule items, the DME Defendants represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

265.   Instead, the DME Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

266.   The DME Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment –with low-cost and low-quality Fraudulent Equipment.

267.   When the DME Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the DME Defendants fraudulently represented that the reimbursement they sought was 150% of their acquisition cost of the Fraudulent Equipment. In actuality, the DME Defendants' legitimate acquisition cost for the low-quality items dispensed were significantly less.

268.   In an effort to further their scheme, upon information and belief, the DME Defendants, purposefully did not consider or even research the cost to the general public of the low-cost and low-quality Non-Fee Schedule items purportedly provided to the Insureds.

269.   In keeping with the fact that the DME Defendants fraudulently misrepresented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the DME Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

270.   As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibit "1" virtually always misrepresented the permissible reimbursement amount.

271.   For example, in cases where Insured were prescribed "Infrared Heat Lamp" or "Infrared Lamp", the DME Defendants billed GEICO for an "Ultraviolet Therapy System" under HCPS Code E0691 with a charge of $673.94 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

272.   However, to the extent that that the DME Defendants actually provided Insureds with an Ultraviolet Therapy System, the DME Defendants inflated the cost of this product. During GEICO's investigation, GEICO determined that the abovementioned model for the

infrared ultraviolet UV lamp billed to GEICO were available for purchase to the general public on Amazon for $375.00- nearly half of the charge submitted by the DME Defendants.

273.   In virtually all of the charges submitted to GEICO for infrared heat lamps, the DME Defendants fraudulently sought reimbursement for $673.984 per unit when the maximum reimbursement charge was no greater than the cost to the general public at $375.00 per unit.

274.   Similarly, the DME Defendants billed GEICO for a whirlpool under HCPCS Code E1310 with a charge of $1,610.55 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

275.   During its investigation, GEICO determined that the item billed were available for purchase to the general public on the internet on Amazon for $174.99.

276.   In virtually all of the charges submitted to GEICO for a whirlpool, the DME Defendants fraudulently sought reimbursement for $1,610.55 per unit when the maximum reimbursement charge was no greater than the cost to the general public at $174.99 per unit.

277.   In each of the claims identified within Exhibit "1" for Non-Fee Schedule items, the DME Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for Non-Fee Schedule items were the lesser of 150% of the acquisition cost or the cost to the general public.

III.   <u>**The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**</u>

278.   To support their fraudulent charges, the DME Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, prescriptions, and/or other supporting records to GEICO through and in the name of Marta Medical, seeking payment for Fraudulent Equipment.

279.   The NF-3 forms, HCFA-1500 forms, prescriptions and other supporting records that the DME Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)      The NF-3 Forms, HCFA-1500 Forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that Marta Medical was not licensed with the New York City Department of Consumer Affairs as required by NYC Admin. Code §20-426.

(ii)     The NF-3 Forms, HCFA-1500 Forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Equipment was medically necessary and intended for genuine patient care. In fact, the Fraudulent Equipment was the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

(iii)    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the DME Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the DME Defendants did not comply with all material licensing requirements in that they (a) engaged in illegal, collusive relationships with the Clinic Controllers in order to steer voluminous and illegal prescriptions to the Marta Medical for the Fraudulent Equipment, in exchange for the payment of kickbacks and other financial incentives, and (b) provided Fraudulent Equipment based on decisions made by laypersons and/or unauthorized prescriptions not based upon legitimate prescriptions from licensed healthcare providers for medically necessary items.

(iv)    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because – to the extent that the DME Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms and HCFA-1500 forms.

(v)     The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the DME

Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because – to the extent that the DME Defendants provided any Fraudulent Equipment to the Insureds – the DME Defendants falsified the permissible reimbursement amount for Non-Fee Schedule items identified in the NF-3 forms, HCFA-1500 forms, and prescriptions.

**IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

280.   The DME Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

281.   To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the DME Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

282.   Specifically, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – the result of unlawful financial arrangements, were provided to the DME Defendants, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

283.   Additionally, the DME Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the Defendants were – not based upon medical necessity but – based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

284.   Furthermore, the DME Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME and/or OD, and not by an actual healthcare provider's prescription for medically necessary DME and/or OD, in order to

prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

285.   Even more, the DME Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the DME Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

286.   Lastly, the DME Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the DME Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

287.   Once GEICO began to suspect that the DME Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, to determine whether the charges submitted through the DME Defendants were legitimate. Nevertheless, in an attempt to conceal their fraud, the DME Defendants failed and/or refused to comply with GEICO's requests for verification of the charges submitted.

288.   GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

289.   In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the

defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

290.    The DME Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

291.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $168,400.00 based upon the fraudulent charges.

292.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Marta Medical**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

293.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 326 of this Complaint as if fully set forth at length herein.

294.    There is an actual case in controversy between GEICO and Marta Medical regarding more than $1,235,000.00 in fraudulent billing for Fraudulent Equipment that has been submitted to GEICO in the name of Marta Medical.

295.    Marta Medical has no right to receive payment for any pending bills submitted to GEICO because Marta Medical was never licensed with the New York City Department of Consumer Affairs and therefore, was never eligible for reimbursement of No-fault benefits.

296.   Marta Medical also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – upon predetermined fraudulent protocols without regard for genuine patient care.

297.   Marta Medical has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – upon its participation in unlawful financial arrangements.

298.   Marta Medical has no right to receive payment for any pending bills submitted to GEICO because Marta Medical purportedly provided Fraudulent Equipment based on decisions made by unlicensed laypersons and/or unauthorized prescriptions rather than prescriptions legitimately issued by the Prescribing Practitioners who are licensed to issue such prescriptions.

299.   Marta Medical has no right to receive payment for any pending bills submitted to GEICO because – to the extent Marta Medical actually provided any Fraudulent Equipment – Marta Medical fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds and/or fraudulently inflated the permissible reimbursement rates for the Fraudulent Equipment.

300.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Marta Medical.

## SECOND CAUSE OF ACTION
### Against Zubchenko
### (Violation of RICO, 18 U.S.C. § 1962(c))

301.   GEICO repeats and realleges each and every allegation in the paragraphs set forth above.

302.   Marta Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

303.   Zubchenko knowingly conducted and/or participated, directly or indirectly, in the conduct of Marta Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Marta Medical was not eligible to receive under the New York No-Fault laws because:  (i) the NF-3 Forms, HCFA-1500 Forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements, when in fact Marta Medical was not licensed with the New York City Department of Consumer Affairs as required by NYC Admin. Code §20-426; (ii) Marta Medical submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols without regard to genuine patient care; (iii) Marta Medical submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful kickback and financial arrangements; (iv) to the extent that Marta Medical actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently misrepresented that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, the prescriptions used to support the charges for Fraudulent Equipment were forged, unauthorized by the prescribing practitioner, or illegally duplicated; and (vi) to the extent that Marta Medical actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the nature of the items and the permissible reimbursement amounts. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

304.   Marta Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Zubchenko operates Marta Medical, insofar as Marta Medical is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Marta Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Marta Medical continues to attempt collection on the fraudulent billing submitted by Marta Medical to the present day.

305.   Marta Medical is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Marta Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

306.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $168,400.00 pursuant to the fraudulent bills submitted through Marta Medical.

307.   By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Zubchenko and John Doe Defendants "1" - "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

308.   GEICO repeats and realleges each and every allegation in the paragraphs set forth above.

309.   Marta Medical is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

79

310.   Zubchenko and John Doe Defendants "1" - "10" are the owners of, employed by, or associated with the Marta Medical enterprise.

311.   Zubchenko and John Doe Defendants "1" - "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Marta Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Marta Medical was not eligible to receive under the New York No-Fault Laws because: (i) the NF-3 Forms, HCFA-1500 Forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements, when in fact Marta Medical was not licensed with the New York City Department of Consumer Affairs as required by NYC Admin. Code §20-426; (ii) Marta Medical submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed without regard for genuine patient care; (iii) Marta Medical submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful kickback and financial arrangements; (iv) to the extent that Marta Medical actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently misrepresented that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, the prescriptions used to support the charges for Fraudulent Equipment were forged, unauthorized by the prescribing practitioner, or illegally duplicated; and (vi) to the extent that Marta Medical actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the nature of the items and the permissible reimbursement amounts.

A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

312.   Zubchenko and John Doe Defendants "1" - "10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

313.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $168,400.00 pursuant to the fraudulent bills submitted through Marta Medical.

314.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Marta Medical and Zubchenko
### (Common Law Fraud)

315.   GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 326 of this Complaint as if fully set forth at length herein.

316.   Marta Medical and Zubchenko intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

317.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Defendants were in compliance with all material licensing requirements when in fact Marta Medical was not licensed with the New York City Department of Consumer Affairs as required by NYC Admin. Code §20-426; (ii) in every claim,

that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when the prescriptions were not based upon medical necessity and issued without genuine regard for patient care; (iii) in every claim, that the Defendants were in compliance with all material licensing requirements Marta Medical submitted bills to GEICO when instead the Fraudulent Equipment that it purportedly provided to Insureds was based upon prescriptions obtained through unlawful kickback and financial arrangements; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon legitimate prescriptions for medically necessary DME and/or OD by licensed healthcare providers when instead the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, that the prescriptions for Fraudulent Equipment were reasonable, medically necessary, and valid, when instead the prescriptions used to support the charges for Fraudulent Equipment were forged, unauthorized by the prescribing practitioner, or illegally duplicated; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that bills to GEICO properly characterized the Fraudulent Equipment and the permissible reimbursement amounts for each item when instead they the items did not meet the requirements for the specific HCPCS Codes billed to GEICO or misrepresented the permissible reimbursement amount.

318.   Marta Medical and Zubchenko intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Marta Medical that were not compensable under the No-Fault Laws.

319.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $168,400.00 pursuant to the fraudulent bills submitted by the Defendants through Marta Medical.

320.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

321.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Marta Medical and Zubchenko**
**(Unjust Enrichment)**

322.   GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 326 of this Complaint as if fully set forth at length herein.

323.   As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

324.   When GEICO paid the bills and charges submitted by or on behalf of Marta Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

325.   The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

326.   The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

327.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $168,400.00.

### SIXTH CAUSE OF ACTION
**Against John Doe Defendants "1"-"10"**
**(Aiding and Abetting Fraud)**

328.   GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 325 of this Complaint as if fully set forth at length herein.

329.   John Doe Defendants "1"-"10" knowingly aided and abetted the fraudulent scheme perpetrated against GEICO by the Defendants..

330.   The acts taken by John Doe Defendants "1"-"10" in furtherance of the fraudulent scheme include knowingly: (i) provided prescriptions for Fraudulent Equipment that were billed to GEICO by the Defendants as a result of unlawful financial arrangements; (ii) provided prescriptions for Fraudulent Equipment that were billed to GEICO by the Defendants pursuant to predetermined fraudulent protocols and without regard for medical necessity; (iii) provided prescriptions for Fraudulent Equipment that were intentionally generic, vague and/or unauthorized so as to allow the Defendants to unlawfully decide the specific type of Fraudulent Equipment to purportedly provide Insureds, and subsequently bill GEICO; (iv) participated in each of the foregoing acts with knowledge that the prescriptions would be used by the Defendants to support their fraudulent claims; and (iv) ensured that the prescriptions for Fraudulent Equipment were given to the Defendants rather than to the patients.

331.   The conduct of John Doe Defendants "1"-"10", as more fully described above, were in furtherance of the fraudulent scheme and were significant and material.

332.   The conduct of John Doe Defendants "1"-"10", as more fully described above, were a necessary part of and were critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for the Defendants to bill GEICO for Fraudulent Equipment.

333.   John Doe Defendants "1"-"10" each aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges for Fraudulent Equipment that were not

compensable under the No-Fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

334.   The conduct of John Doe Defendants "1"-"10" caused GEICO to pay money based upon the fraudulent charges submitted to it through Marta Medical in an amount to be determined at trial, but in no event less than $168,400.00 .

335.   The extensive fraudulent conduct of John Doe Defendants "1"-"10" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

336.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Marta Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Marta Medical has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Zubchenko, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $168,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Zubchenko and John Doe Defendants "1" - "10", compensatory damages in an amount to be determined at trial but in excess of $168,400.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of action against Marta Medical and Zubchenko, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $168,400.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

E.     On the Fifth Cause of Action against Marta Medical and Zubchenko, more than $168,400.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

F.     On the Sixth Cause of Action against John Doe Defendants "1"-"10", more than $168,400.00  in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: March 24, 2022
       Uniondale, New York

                                  RIVKIN RADLER LLP

                                By:   */s/  Michael A. Sirignano*
                                        Barry I. Levy, Esq.
                                        Michael A. Sirignano, Esq.
                                        Michael Vanunu, Esq.
                                        Melissa D. Medilien, Esq.
                                926 RXR Plaza
                                Uniondale, New York 11556
                                (516) 357-3000

                                *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*